Binfield v. State.

STEPHEN BINFIELD, PLAINTIFF IN ERROR, v. THE STATE OF NEBRASKA.

1. **Practice in Criminal Cases.** In the trial of criminal cases, it is a matter of discretion on the part of the court whether it will or not order that the witnesses be examined out of the hearing of each other.

2. **Dying Declarations.** In the case at bar, the dying declarations of the deceased were properly admitted.

3. **Homicide:** THREATS OF DECEASED. Upon the trial of a case of homicide, proof of threats made by deceased against the accused, but which had not been communicated to him at the time of the homicide, should only be admitted when the making of such threats, or a state of feeling toward the accused on the part of the deceased as expressed by such threats, may tend to illus-

trate or explain some act of the deceased, which in some view might tend to justify or excuse such homicide.

4. **Instruction.** It is not error on the part of the court to refuse to give an instruction, however faultless in point of law, when the same in substance and almost in the same language has already been given.

5. **Evidence.** The unsupported testimony of the accused in a criminal case, which the jury do not believe, cannot be said to furnish an hypothesis consistent with the innocence of the accused.

6. ———: NAME. The name which a man "always went by," which he declares is his name in his dying declaration, and by which his own mother knew him, may be deemed his right name although one witness has testified that it was not "his right name."

7. ———: PLACE OF DECEASE. Where the evidence shows that the deceased was shot in H. county, taken to the house of his step-father a half mile away, kept there a few days, and taken to the house of Mrs. P., across one channel of Platte river, so as to be more convenient to his attending physician, at which latter place he died, proof that the death actually occurred in H. county will not be required.

ERROR to the district court for Hall county. Indictment for murder in the second degree. Verdict—manslaughter. Sentence—ten years in penitentiary. Trial before NORVAL, J.

*Thummel & Platt* and *T. O. C. Harrison,* for plaintiff in error.

Keeping witnesses separate and apart. Comp. Stat., 713. Dying declarations. 1 Greenleaf Ev., § 158. *Rakes v. People,* 2 Neb., 157. *Starkey v. People,* 17 Ill., 17. *Montgomery v. State,* 11 Ohio, 424. *People v. Phillips,* 1 Park. Cr., 306. Uncommunicated threats. *Holler v. State,* 37 Ind., 57. Horrigan & Thompson Cases on Self Defense, 490. *Stokes v. People,* 53 N. Y., 164. Evidence. *Horne v. State,* 1 Kan., 42. *State v. Collins,* 20 Iowa, 85. *French v. State,* 12 Ind., 670. *State v. Waterman,* 1 Nev.,

543.   Variance in name.  1 Wharton, 256–8.   Roscoe Cr. Ev., 81.   *State v. Curran*, 18 Mo., 320.

*Isaac Powers, Jr., Attorney General,* for the State.

Dying declaration.  *Fitzgerald v. State,* 11 Neb., 577. *Robbins v. The State,* 8 Ohio State, 131.   Uncommunicated threats.   *Powell v. State,* 19 Ala., 577.   *People v. Henderson,* 28 Cal., 465.   *Combs v. State,* 75 Ind., 215.   Variance.   *State v. Gardiner,* Wright's Rep., 392.   Crim. Code, § 483.

COBB, CH. J.

The first point made by plaintiff in his brief is, that "the court erred in overruling the motion of plaintiff in error for the exclusion of the witnesses of the state and defendant, and to keep them separate and apart," and he cites sec. 301, p. 713, Comp. Stat.   This section provides as follows: "The magistrate, if requested, or if he sees good cause therefor, shall order that the witnesses on both sides shall be examined, each one separate from all the others, and that the witnesses for may be kept separate from the witnesses against the accused during the examination."   It can scarcely be seriously contended that the provisions of this section apply to trials in the district court.   Its language expressly refers to "the magistrate," and it is one of the sections of a chapter of the criminal code entitled, "Adjournment and examination before a magistrate."   Section 248, p. 705, provides that "the term 'magistrate' in this code, when not otherwise expressly stated, is used to mean a justice of the peace, probate judge, mayor of a city or incorporated village, or police judge."   So that the above provision applies only to inferior judicial officers holding courts of examination for the purpose of committing offenders, or of holding them to bail, and does not apply to trials in the district court.   Our statute, I think, is quite

silent as to the duty of the district court in case of an application of this character.

Upon this subject the law is thus stated by Greenleaf in his work on Evidence, sec. 432: "If the judge deems it essential to the discovery of truth that the witnesses should be *examined out of the hearing of each other*, he will so order it. This order, upon the motion or suggestion of either party, is rarely withheld; but, by the weight of authority, the party does not seem entitled to it as a matter of right." In this also agree all of the cases which I have been able to find, except in the cases where the matter is regulated by express statute. See *State v. Fitzsimmons*, 30 Mo., 236. *Benaway v. Conyne*, 3 Chand. (Wis.), 214. And *Erissman v. Erissman*, 25 Ills., 136.

The second point is, that "the court erred in admitting the dying declaration of Wendall Tillman to be read in evidence." I quite agree with counsel that "dying declarations to be used in evidence must be made not only in *articulo mortis*, but under the sense of impending death, and that the party was of such a state of mind that he had a clear understanding of the contents of the document that he is said to have signed, and can only be used when death is the subject of the charge, and the circumstances of the death the subject of the declaration." But I fail to see, nor is it pointed out, in what respect the proof fails to bring this case within the rule as above stated, or as laid down in any of the authorities cited. I have some doubt as to whether a dying declaration should be received, when every fact therein contained has already been testified to by living witnesses, and where there is scarcely any conflict in the testimony as to those facts. But in no other point of view can there be the least doubt as to the admissibility of the declaration of the deceased in this case.

The third point made is, that the court erred in refusing to admit the testimony of William Hohman as to uncommunicated threats made by the deceased against the defendant Binfield.

I understand the cases, where uncommunicated threats have been admitted in evidence, or most of them, to turn upon the question of self-defense. Indeed, the same might be said of evidence of threats generally, whether communicated or uncommunicated. To prove to the jury in a homicide case that the deceased had threatened to take the life of the prisoner, or to inflict great personal injury upon him, is to give them a key for the interpretation of the acts and motives of the prisoner and of the deceased, in cases where such threats had been previously communicated to the prisoner, and of the acts and motives of the deceased whether the threats had been communicated or not. In many cases the appearance of being driven to the wall, of a man who had lately threatened the life of his adversary, might be looked upon with just suspicion, when in the absence of such threats it would not be, and this without regard to whether such threat had been communicated to the party or not. In the case at bar there was no evidence of any act on the part of deceased to be illustrated by evidence of threats on his part towards the prisoner. As I understand the law, it would have been no error on the part of the court to have excluded even the communicated threats in this case, because upon the facts proved, the making of the threats furnished no possible justification or excuse for the homicide, nor tended to illustrate or explain acts of the deceased in such a way as to furnish any justification or excuse therefor.

The fourth point is, that the court erred in refusing to give in charge to the jury the No. 7 of defendant's prayers. Said prayer was in the following words:

"No 7. That it is incumbent upon the state, in order to sustain the charge, to prove beyond a reasonable doubt that the specific intent there charged actually and in fact existed in the mind of the defendant at the time he committed the act, that it is incumbent upon the state, if it would establish an intent to kill, to prove beyond a rea-

sonable doubt that at the time he committed the act the defendant in fact intended to take life." While I find no fault with the principle set out in the above prayer, I think that its language would be well calculated to mislead a jury. But were there no objection to its language, the refusal to give it cannot be urged as error on the part of the court, because the same principles of law were contained in the charge already given. The charge of the court to the jury is too lengthy to be reproduced here, covering at least twelve pages of legal cap in fine hand. It contains every principle of law necessary to the proper guidance of the jury in the case, and meets our approval.

Under the fifth head are grouped several alleged errors, under the general designation of error in refusing to grant a new trial.

1. "To warrant a conviction in a criminal case, the evidence should exclude every other reasonable hypothesis other than the defendant's guilt." This proposition will not be disputed. But it must be borne in mind that everything that may be sworn to by a witness or a party, is not necessarily evidence. The plaintiff in error himself testified that he took the loaded needle gun from the wagon and rode after the fleeing deceased for the purpose of compelling him to give up the whip, which deceased had taken away from him that morning. Upon coming up with him, deceased turned his pony's head around, and they were so close together that their ponies' heads might have touched each other; that the accused cocked his gun, pointed it at deceased, demanded his whip, and threatened to shoot him, when the gun went off accidentally and shot the deceased. This, it is urged, furnishes a reasonable hypothesis consistent with the innocence of the accused. Of course, if the jury believed the statement of the accused, that the gun went off accidentally, that he never intended to fire, that he did not pull the trigger, they could not find him guilty. But they had a right to disbelieve him; and, under the

circumstances, it was impossible for them to believe that part of his statement which, if true, could be known to none but him, and, if false, could be disproved by no direct testimony. Not being believed by the jury, this testimony furnished no evidence of any hypothesis whatever.

2. "For the reason that a fatal variance occurred between the name of the deceased in the indictment and the proof." There was one witness who, upon his cross-examination, testified that the right name of deceased was "*John Wendell C. Sower*, but that he always went by the name Wendell Tillman." In his dying declaration he called himself by the latter name, and by that name his own mother seems to have known him. How any other than that by which he always went, and by which his own mother knew him, come to be his right name does not appear. The jury had sufficient evidence before them to sustain their verdict in respect to the name of the victim, as well as the other ingredients of the offense.

3. "That the state failed to prove that the deceased died in Hall county." The evidence before the jury was, I think, sufficient to sustain the verdict on that point, even were there no doubt of the proposition, that in order to sustain the indictment, the state must prove that the deceased died in Hall county. There is positive and undisputed testimony that the deceased was shot in Hall county. The witness, Mrs. Taylor, deceased's mother, after testifying to going out after him, where he was shot, and meeting the Bunsons bringing him in their wagon, that they arrived at her house, is asked how long he was kept there; to which she answered, about three weeks. She was then asked "What did they do with him then?" Her answer was, "He was taken to Mrs. Powell's, because the river was coming up, and the doctor did not like to cross." To the question, "How did you move him?" she answered, "We put him in the bed of a wagon." She further an-

Binfield v. State.

swered that he lived about nine days after they took him there, and died on the second day of June.

Ernest Reisland testified that he knew the deceased in his life time; that he died at the residence of Mrs. Martha Powell, on the second day of June, 1882. His examination continued as follows:

Q. Was you present at the time of his death?

A. Yes, sir.

Q. State how frequently you was with him during his confinement.

A. From the start, when he was on the island I was with him every other day, and at the residence of Mrs. Martha Powell I was with him all the time, etc.

I think that no witness testified directly that Mrs. Martha Powell's residence was in Hall county. The witness, Thomas A. Evans, testified that her residence was about four miles from Wood River Station. All of the witnesses in the case were residents of Hall county. Many of them testify to having visited deceased almost or quite daily while at Mrs. Powell's house.

The only principle of law which occurs to me as controlling this objection is, that when a certain status is proved to exist as to a person or thing, such status will be presumed to continue until the contrary be shown. The deceased having been proved to have been shot in Hall county, although there is proof of his having been removed from the house of his step-father to the house of Mrs. Powell, so as to be more convenient to his attending physician, in the absence of any evidence to the contrary it must be presumed, and the jury were justified in finding, that he remained within the limits of Hall county until his death.

The judgment of the district court is affirmed.

JUDGMENT AFFIRMED.

THE other judges concur.