## In re BURSTEIN.

(City Court of New York, Special Term. September, 1910.)

**1.** NAMES (§ 20*)—CHANGE OF NAME—STATUTORY PROCEEDING—PETITION.

Under Code Civ. Proc. § 2412, providing that a petition for a change of name by decree must be in writing signed by the petitioner, verified as a pleading, and must specify the grounds of the application, the name, age, and residence of the individual whose name is proposed to be changed, and the name which he proposes to assume, a petition alleging petitioner's age, name, and residence, that he was born in the United States, that the desired change· was not to deceive or mislead, that he had no outstanding debts or judgments against him, and the reason why he desired to change, was fatally defective for failure also to allege that he was a citizen of the United States for at least six months prior to making the application, and for failure to state whether he was married or single, whether he was a party to any and what action or proceeding in the courts, whether there was any outstanding bonds, or commercial paper made, indorsed, or accepted by him in the name which he wished to abandon, together with his birthplace, the name of his parents, etc.

[Ed. Note.—For other cases, see Names, Cent. Dig. § 18; Dec. Dig. § 20.*]

**2.** NAMES (§ 20*)—CHANGE—ADOPTION.

Code Civ. Proc. §§ 2410, 2412, 2414, 2415, providing for a change of name by decree, is not exclusive and does not prevent a party from changing his name without judicial proceedings by merely adopting a new name and recognition thereof by his friends and acquaintances.

[Ed. Note.—For other cases, see Names, Cent. Dig. § 18; Dec. Dig. § 20.*]

Application by Bernard Elliot Burstein for an order changing his name to Bernard Elliot Burston. Application denied.

M. A. Sachs, for petitioner.

FINELITE, J. The said Burstein presents a petition to this court for an order allowing him to change his name from Bernard Elliot Burstein to Bernard Elliot Burston, which petition reads as follows:

"(1) That your petitioner's name is Bernard Elliot Burstein, and that he resides in the borough of Manhattan, city of New York, at 548 West 165th street. (2) That your petitioner is 23 years of age, having been born in the United States, and that he was admitted to practice as an attorney and counselor at law in October, 1909. (3) That your petitioner desires to assume the name of Bernard Elliot Burston, changing the 'e–i' of his last name to 'o.' (4) That the reason for desiring to assume the name Burston instead of Burstein is because during his college days he was known as Burston, and not as Burstein, and that he is not known to be the Burston by his friends; that he is yet called Burston, and that Burstein is confounded with others of like name. (5) That the name Bernard Elliot Burston is not to deceive or mislead, but, on the contrary, to intend to substantially promote the interests of your petitioner. (6) That your petitioner has no outstanding debts and that there are no judgments against him. That by reason of the foregoing facts your petitioner respectfully asks that an order be entered changing his name from Bernard Elliot Burstein to Bernard Elliot Burston, all for which no other application has been made to any other court or judge."

By section 2412 of the Code of Civil Procedure:

"The petition must be in writing, signed by the petitioner, and verified in like manner as a pleading in a court of record, and must specify the grounds

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of the application, the name, age and residence of the individual whose name is proposed to be changed, and the name which he proposes to assume."

By section 2414 of the Code of Civil Procedure:

"If the court to which the petition is presented is satisfied thereby or by the affidavit and certificate presented therewith that the petition is true, and that there is no reasonable objection to the change of name proposed, * * * the court shall make an order authorizing the petitioner to assume the name proposed on a day specified therein, not less than thirty days after the entry of the order. The order shall be directed to be entered, and the papers on which it was granted to be filed within ten days thereafter in the clerk's office of the county in which the petitioner resides, if he be an individual, or in the office of the clerk of the City Court of New York if the order be made by that court. Such order shall also direct the publication, within ten days after the entry thereof, of a copy thereof in a designated newspaper in the county in which the order is directed to be entered at least once."

By section 2415 of the Code of Civil Procedure:

"If the order shall be fully complied with, and within forty days after the making of the order an affidavit of the publication thereof shall be filed and recorded in the office in which the order is entered, and in each office in which certified copies thereof are required to be filed, if any, the petitioner shall, on and after the day specified for that purpose in the order, be known by the name which is thereby authorized to be assumed, and by no other name."

By section 2410 of the Code of Civil Procedure:

"A petition for leave to assume another name may be made by a resident of the state to the County Court of the county in which he resides, or, if he resides in the city of New York, either to the Supreme Court or to the City Court of New York. * * *"

In the Matter of Hamilton, 10 Abb. N. C. 79 (decided in June, 1881, Court of Common Pleas) Van Hoesen, J., held:

"It is our rule in these matters to acquire evidence by affidavit or by petition whether the applicant is married or single, whether he is now a party to any and what action or proceeding in the courts, whether there are any judgments against him, whether there is any outstanding bond or commercial paper made, indorsed or accepted by him in the name which he wishes to abandon; of his age, birthplace and the name of his parents."

See Snook's Petition, 2 Hilt. (N. Y.) 567.

The petition here presented fails to allege the essential facts as pointed out in the cases last cited, and for that reason the application must be refused. In addition to setting forth the essential facts as hereinabove pointed out, the petitioner must allege that he is a citizen of the United States for at least six months prior to making of the application, giving the place, county where he resides, by street and number, and the length of time he has been such resident, before an application for a change of name will be granted. This request seems to be plausible, for the reason when an individual desires to obtain protection of the courts, and as well the protection of his creditors' rights, that the latter may know that he is a resident and amenable to the process of our courts. Although at common law there was no obstacle for an individual to assume any name he desired, as a man may legally name himself or acquire a name by reputation, general usage, and habit. At common law a man can change his name in good faith and for an honest purpose by adopting a new one, and transacting his

business and holding himself out to his friends and acquaintances thereunder, with their acquiescence and recognition. But as the petitioner applies to the court for an order for his change of name, the statute under which he applies (Code Civ. Proc. § 2412), authorizing a change of name, may limit the common-law right, in that it provides that on and after the day specified in the order of the court for the change to take effect he be, and shall be, known by the name which he is thereby authorized to assume, and by no other name (Code Civ. Proc. § 2415); "it may well be, therefore, that after a man has acquired a name by judicial decree he cannot acquire another without resorting to the courts." Names, and the study of proper names of persons and places, are not without scientific and historical importance, but on the whole are perhaps rather matters of curious interest. It stands to reason that even in the earliest societies of "articulate speaking men" all known persons, places, and groups of human beings must have had names by which they could be spoken of and by which they were recognized. The conferring of a name upon a person was in the early Biblical times generally connected with some circumstance of birth; several of Jacob's sons are recorded as having received their names in this manner (Gen. xxx). Generally it was the mother who chose the name, as in the instances referred to; but here sometimes the father chose it (Gen. xvi, 15; xvii, 19; xxi, 2); while occasionally other persons than the parents were the name givers, as in the cases of Moses (Ex. ii, 10) and Solomon (II Sam. xii, 25). In early times it appears to have been the custom to confer the name immediately upon birth, as among modern Arabs, but later on it was given to the boy on circumcision (comp. Luke i, 59, ii, 21). Before the exile children seemed never to have been named after their relatives, not even in the royal family. None of the 21 kings of Judah was named after a predecessor or after David, the founder of the family. On the other hand, Jonathan's son and Saul's natural son were both named Meribaal (II Sam. xxi, 7 et seq.). Instead of repeating the same name, however, it seems to have been the custom to make use of one of the elements of the family name; thus Ahitub has two sons, Ahijah and Ahimelech. Three of Saul's family have the element ba-al (changed to "basheth") in their names. As a consequence of this avoidance of repetition a single name was as a rule sufficient to identify a person, and it is only in the later stages of Hebrew tradition that it was found necessary to give the name of the father in order to identify the son, as for instance, in the case of Jaazanih-ben-Shapan (Ezek. viii, 11). As the Jews spread throughout the land bordering the Mediterranean, they drew upon other languages for their personal names while still retaining Biblical ones. These new names so adopted became popular in Italy, Persia, Arabia, and Turkey. As a consequence certain names became characteristic of certain districts, some of the older names were revived, and the most striking tendency of the post-Talmudic period is the general choice of local names by the Jews for their civic relations. This led to the adoption of two names, one for civic purposes and the other for the use of Hebrew documents. In 1787 an order was issued by the Austrian Empire which compelled Jews to adopt surnames, though their choice of given names was restricted mainly to the Biblical ones.

Commissions of officers were appointed to register all the Jewish inhabitants under such names. If a Jew refused to select a name the commission was empowered to force one upon him. This led to a wholesale creation of artificial surnames, of which Jewish nomenclature bears the traces to the present day. Napoleon also, in a decree of July 20, 1808, insisted upon the Jews adopting fixed names. While various governments thus forced the Jews to adopt surnames, they were at the same time inclined to limit their freedom in the selection of given names. In Bohemia the provisions of the law which was passed in 1787 restricting them to Biblical names were not rescinded. until August 11, 1836. The Prussian government in the same year attempted to introduce a similar restriction in that state, which led to Zung producing his classical monograph, "Die Namen der Juden," in which he showed from examples taken from all periods that the Jews had freely adopted the current and popular names of their neighbors in all parts of the globe. Owing mainly to this "tour de force" the exactment was not pressed. Similar rules have been passed by the Russian government from time to time, but without producing much effect, though even at the present day a Jewess must not bear such a name as Clara. Nicknames seem not to be so frequently adopted among Jews. Instead of nicknames modern Jews use contractions of Hebrew descriptive names (Jewish Ency. vol. 19).

There is no necessity for said petitioner, if he desires to assume another name, to apply to the court for the change thereof. As was said in Smith v. U. S. Casualty Co., 197 N. Y. 420, 423, 90 N. E. 947, 948:

"As the common law rests so largely upon the customs of the people, it is often necessary to search the history of remote periods, both in England and in this country, in order to learn its full scope and meaning. While the legal name of a person now consists of a given name, or one given by his parents, and a surname, or one descending from them, history shows that this was not always the case. In the early life of all races, surnames were unknown, while given names have been used from the most distant times to identify and distinguish a particular individual from his fellows. In England surnames were unknown until about the tenth century, and they did not come into general use or become hereditary until many years later. 8 Nelson's Encyc. 386. At first they were used sometimes for an easy method of identification and at others from accident, caprice, taste, and a multitude of other causes. Mr. Bardsley in his History of English Surnames gives thousands of instances of change through selection, the action of neighbors in applying descriptive epithets, the use of nicknames and pet names, and the gradual development through circumstances and the necessity of identification as population increased. Thus the son of John or Peter became known as John's son or Peter's son, and finally as Johnson or Peterson, aside from his given name. It is well known that the word meaning 'son' in different languages, such as Fitz and Mac, was prefixed to the Christian name of the father to give the son a surname, and 'O' to give one to the grandson, and thus we have the names FitzGerald, MacDonough, O'Brien and many others. The place of birth or residence, the name of an estate, the business pursued, physical characteristics, mental or moral qualities and the like were turned into surnames. It is to be noted, however, that the surname in its origin was not as a rule inherited from the father, but either adopted by the son or bestowed upon him by the people of the community where he lived. Dudgeon's Origin of Surnames, 252. Father and son did not always have the same surname, and it was not regarded as important, for both frequently had more than one. Coke wrote in the fore part of the seventeenth century: 'Special heed is to

be taken of the name of baptism, as a man cannot have two, though he may have divers surnames.' Coke Lit. (1st Am. Ed.) 3, a. m.

"So in Button v. Wrightman (Popham's Reports, 56) the learned Chief Justice and reporter said: 'Anciently men took most commonly their surnames from their places of habitation, especially men of estate, and artisans often took their names from their arts; but yet the law is not so precise in the case of surnames, and therefore a grant made by or to John, son and heir or I. C. or filio juniori, I. S., is good, but for the Christian name this always ought to be perfect.' Camden mentions a man with eight sons, each with a different surname and not one with that of his father. Camden's Remain's, 141. In a scholarly opinion by Chief Judge Daly, to which we are much indebted, many instances are mentioned where the color of the individual, as White, Black, or Brown; his height or strength, as Little, Long, Hardy, or Strong; mental or moral attributes, as Good, Wiley, Gay, Moody, or Wise, fixed the surname. In re Snook, 2 Hilt. (N. Y.) 566. The learned judge continued: 'The surname was frequently a chance appellation, assumed by the individual himself or given to him by others for some marked characteristic, such as his mental, moral or bodily qualities, some peculiarity or defect, or for some act he had done which attached to his descendants; while sometimes it did not. * * * It was in this way that the bulk of our surnames that are not of foreign extraction originated and became permanent. They grew into general use without any law commanding their adoption or prescribing any course or mode respecting them; * * * but though the custom is widespread and universal for all males to bear the names of their parents, there is nothing in law prohibiting a man from taking another name if he chooses. There is no penalty or punishment for so doing, nor any consequence growing out of it, except so far as it may lead to or cause a confounding of his identity.'

"The history of literature and art furnishes many examples of men who abandoned the name of their youth and chose the one made illustrious by their writings or paintings. Melanchthon's family name was Schwartzerde, meaning black earth, but as soon as his literary talents developed and he began to forecast his future he changed it to the classical synonym by which he is known to history. Rembrandt's father had the surname Gerretz, but the son when his tastes broadened and his hand gained in cunning changed it to Van Ryn on account of its greater dignity. A predecessor of Honoré De Balzac was born a Guez, which means beggar, and grew to manhood under that surname. When he became conscious of his powers as a writer he did not wish his works to be published under that humble name, so he selected the surname Balzac from an estate that he owned. He made the name famous, and the later Balzac made it immortal. Voltaire, Molière, Petrarch, Richelieu, Loyola, Erasmus, and Linnæus were assumed names. Napoleon Bonaparte changed his name after his amazing victories had lured him toward a crown and he wanted a grander name to aid his daring aspirations. The Duke of Wellington was not by blood a Wellesley, but a Colley, his grandfather, Richard Colley, having assumed the name of a relative named Wesley, which was afterward expanded to Wellesley. S. Baring-Gould's Famous Names and Their Story, 391. This author in his chapter on changed names gives many examples of men well known to history who changed their names by simply adopting a new one in place of the old.

"Mr. Walsh in his Handbook of Literary Curiosities makes an interesting statement at page 778: 'Authors and actors know the value of a mouth-filling name. Herbert Lythe becomes famous as Maurice Barrymore, Bridget O'Toole charms an audience as Rosa d'Erina, John H. Broadrib becomes Henry Irving. Samuel L. Clemens and Charles R. Browne attract attention under the eccentric masks of Mark Twain and Artemus Ward. John Rowlands would never have become a great explorer unless he had first changed his name to Henry M. Stanley. James B. Matthews and James B. Taylor might have remained lost among the mass of magazine contributors but for their cunning in dropping the James and standing forth as Brander Matthews and Bayard Taylor. Would Jacob W. Reid have succeeded as well as Whitelaw Reid?' While some of these names were merely professional pseudonyms, others

were adopted as the real name and in time became the only name of the person who assumed it.

"Many other instances of voluntary change of name, both given and surname, might be added, but we will mention only two more. In Larke's General Grant and His Campaigns (page 13) it is stated, and the fact is well known, that 'Gen. Grant's baptismal name was Hiram Ulysses, and he bore that appellation until he was appointed a cadet at West Point. Gen. Hamer, who nominated him for a cadetship, by some means got his "name mixed up with that of his brother. He was therefore appointed as Ulysses Simpson Grant," and that name once so recorded on the books of the military academy could not be changed. He was baptized into the military school as U. S. Grant, and he has ever since been thus designated.' Another instance, equally well established by current history, is that of President Cleveland, who had the baptismal name of Stephen G. Cleveland. After he entered his teens he omitted the word 'Stephen' and assumed the name of Grover Cleveland, by which he was known throughout his distinguished career.

"Out of the groundwork of custom, as shown by the early history of the subject, the common law sprang and was gradually developed. The ancient custom was for the son to adopt a surname at will, regardless of that borne by his father, and the practice, continued occasionally until the present time, has extended to the given name also. * * * There are but few decisions directly in point, although there are many dicta by eminent judges recognizing as an established rule that a man may change his name, Christian, surname, or both, without resort to legal proceeding.

"In Doe ex dem. Luscombe v. Yates, 5 Barn. & Ald. 544, there was a devise of an estate to one Manning, provided within three years after entering into possession he should procure his name 'to be altered and changed to my name of Luscombe, by act or acts of Parliament, or some other effectual way for that purpose,' and in default of thus changing his name the devise was to become void. Without applying to Parliament for an act of relief or to the king for a license, he adopted the name of Luscombe, and used it for all purposes to the exclusion of his former surname. It was held that he was entitled to retain the estate; the court, through Chief Justice Abbott, saying: 'A name assumed by the voluntary act of a young man at his outset into life, adopted by all who knew him and by which he is constantly called, becomes for all purposes that occur to my mind as much and effectually his name as if he had obtained an act of Parliament to confer it upon him.' In Laflin & Rand Co. v. Steytler, 146 Pa. 434 [23 Atl. 215, 14 L. R. A. 690], an act authorizing the formation of limited partnerships required the articles of association to 'set forth the full names of' the members. The adopted name of one of the partners was given as his full name, and an attempt was made to hold the special partners liable as general partners for that reason. The court defeated the effort, and in discussing the question said: 'A man's name is the designation by which he is distinctively known in the community. Custom gives him the family name of his father and such prænomina as his parents choose to put before it, and appropriate circumstances may require Sr. or Jr. as a further constituent part; but all this is only a general rule from which the individual may depart if he chooses. The Legislature in 1852 provided a mode of changing the name, but that act was in affirmance and aid of the common law to make a definite point of time at which a change shall take effect. Without the aid of that act a man may change his name or names, first or last, and when his neighbors and the community have acquiesced and recognized him by his new designation, that becomes his name.' The case last cited was soon followed by another in the same court to the effect that the requirement of the statute as to 'full names' was 'met by giving the names in the form habitually used by those persons in business and by which they are generally known in the community.' Gearing v. Carroll, 151 Pa. 79, 84 [24 Atl. 1045]. See, also England v. N. Y. Pub. Co., 8 Daly, 375, 381; Cooper v. Burr, 45 Barb. 9, 34; Bell v. Sun Printing & Pub. Co., 42 N. Y. Super. Ct. 567, 569; City Council v. King, 4 McCord [S. C.] 487; Hommel v. Devinney, 39 Mich. 522; Binfield v. State, 15 Neb. 484 [19 N. W. 607]; Linton v. First Nat. Bank [C. C.] 10 Fed. 894; The King v. Inhabitants of Billingshurst, 3 Maule & S. 250.

"The elementary writers are uniform in laying down the rule that at common law a man may change his name at will. Mr. Throckmorton, in his article on Names in the Cyclopedia of Law and Procedure, says: 'It is a custom for persons to bear the surnames of their parents, but it is not obligatory. A man may lawfully change his name without resort to legal proceedings, and for all purposes the name thus assumed will constitute his legal name just as much as if he had borne it from birth.' 29 Cyc. 271. So a writer in the American & English Encyclopædia of Law says: 'At common law a man may lawfully change his name, or by general usage or habit acquire another name than that originally borne by him, and this without the intervention of either the sovereign, the courts, or Parliament; and the common law, unless changed by statute, of course obtains in the United States.' 21 Am. & Eng. Encyc. of Law (2d Ed.) 311. 'One may legally name himself or change his name, or acquire a name by reputation, general usage, and habit.' 2 Fiero, Sp. Pro. (2d Ed.) 847.

"The subject is not affected by the various statutes, commencing in 1847 and continuing with some expansion and changes to the present time, whereby a change of name is authorized by judicial proceedings. Laws 1847, c. 464; Code Civ. Proc. §§ 2410-2415. As was said by the Supreme Court of Pennsylvania of a similar statute in that state, this legislation is simply in affirmance and aid of the common law to make a definite point of time when the change shall take effect. Laflin & Rand Co. v. Steytler, supra. It does not repeal the common law by implication or otherwise, but gives an additional method of effecting a change of name. The statutory method has some advantages, because it is speedy, definite, and a matter of record, so as to be easily proved even after the death of all contemporaneous witnesses. In one respect, however, the statute may limit the common-law right in that it provides that on and after the day specified in the order of the court for the change to take effect the applicant shall 'be known by the name which is thereby authorized to be assumed, and by no other name.' Code Civ. Proc. § 2415. It may well be, therefore, that after a man has acquired a name by judicial decree he cannot acquire another without resorting to the courts."

As the petitioner states in his petition that he is known by the name of Burston by his friends and acquaintances, with their acquiescence and recognition there is no necessity for an order on his application, and for that reason the application must be refused.