ALICE W. SMITH, as Administratrix of the Estate of CLARK M. SMITH, Deceased, Respondent, *v.* UNITED STATES CASUALTY COMPANY, Appellant.

**Change of name — when name may be lawfully changed without application to the court.**

A man may legally name himself, or acquire a name by reputation, general usage and habit. At common law a man can change his name in good faith and for an honest purpose by adopting a new one and transacting his business and holding himself out to his friends and acquaintances thereunder, with their acquiescence and recognition.

·*Semble*, the statute authorizing a change of name may limit the common-law right, in that it provides that on and after the day specified in the order of the court for the change to take effect the applicant shall "be known by the name which is thereby authorized to be assumed, and by no other name." (Code Civ. Pro. § 2415.) It may well be, therefore, that after a man has acquired a name by judicial decree he cannot acquire another without resorting to the courts.

Where a policy of accident insurance was issued to a man by the name under which he had for a period of nine years, just after reaching his majority and up to the issuing of the policy, almost uniformly carried on his business, held himself out and been known and addressed by, it was not error, in an action to recover on the policy, for the court to charge in substance that if the insured assumed and acquired the name under which he was insured and called himself by that name, so that he had thoroughly adopted it to such an extent that the jury could find it was his intention to be known by and retain that name, his representation in the application would not be false, but that if he intended to conceal his real name and identity by giving that name knowing it to be false, then no recovery could be had.

The authorities on the subject of the origin and evolution of names of persons, and the right to change of name by an individual, collated and considered.

*Smith* v. *United States Casualty Co.*, 131 App. Div. 918, affirmed.

·(Argued January 18, 1910; decided February 8, 1910.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the third judicial department, entered March 13, 1909, affirming a judgment in favor of plaintiff entered upon a verdict and an order denying a motion for a new trial.

The action was brought to recover the sum of $5,000, the

amount of an accident insurance policy, upon the allegation that the insured was killed by the accidental discharge of a gun while hunting. The defendant pleaded a breach of warranty and other defenses.

The further material facts are stated in the opinion.

*H. D. Bradbury* for appellant. There was a breach of warranty as to the name of the person whose life was insured. (Code Civ. Pro. § 2415; *Gaines* v. *F. & C. Co.*, 188 N. Y. 411; *Jeffries* v. *E. L. Ins. Co.*, 22 Wall. 47; *Clemens* v. *Supreme Assembly*, 131 N. Y. 485; *Donley* v. *G. F. Ins. Co.*, 184 N. Y. 107; *Butler* v. *M. M. L. Ins. Co.*, 184 N. Y. 337; *Dwight* v. *G. L. Ins. Co.*, 103 N. Y. 341; *Heintz* v. *C. C. Co.*, 121 App. Div. 75; *McGowan* v. *Supreme Court*, 107 Wis. 462; *Willston* v. *Haight*, 76 Conn. 494; *M. A. Society* v. *White*, 100 Penn. St. 12.)

*Alexander C. Eustace* and *J. P. Eustace* for respondent. The full name of the insured at the time of the application was Maurice W. Mansfield, as stated by him therein. (*Matter of Snook*, 2 Hilt. 566; *Doe* v. *Yates*, 5 B. & A. 544; *Linton* v. *F. Nat. Bank*, 10 Fed. Rep. 894; *Cooper* v. *Burr*, 45 Barb. 9; *England* v. *N. Y. P. Co.*, 8 Daly, 375; *L. & R. Co.* v. *Steytler*, 146 Penn. St. 434.)

VANN, J. The subject of this action is an accident insurance policy, dated November 2nd, 1901, which refers to the application as a part thereof, and to the warranties therein contained as part of the consideration of the contract. The application, addressed to the defendant, was signed by the insured under the name of "Maurice W. Mansfield," and the first declaration therein is the following: "I hereby apply for an accident insurance policy to be based on the following statements, which I warrant to be complete and true: (a) My *full* name is Maurice W. Mansfield." The name alone was in writing, the rest of the part quoted being in print, with the word "full" in italics.

The defendant pleaded a breach of warranty, in that "the

true name of said applicant was Myron W. Maynard," of which fact it had no knowledge at the date of the policy, and that relying upon said statement in the application it "issued said policy of insurance in the false and fictitious name of Maurice W. Mansfield."

Upon the trial it appeared that the name of the father and mother of the insured was Maynard, and that he went by the name of Myron W. Maynard until about 1892, when he was twenty-two years of age.   He then called himself Maurice W. Mansfield, and thenceforth, until the policy was issued in 1901, almost uniformly did his business, held himself out and was known and addressed by that name.   The court charged the jury in substance that if the insured, when the application was made, had assumed and acquired the name of Maurice W. Mansfield, and regarded that as his name ; if his acquaintances, the persons with whom he was associated and the people of the community where he lived knew him by that name, and he had "called himself by that name exclusively, or so exclusively and for such a length of time that he had thoroughly adopted it to such an extent that you can find it was his intention that he should be known by the name of Maurice W. Mansfield and thereafter retain that name ; if you should find that he had to this extent acquired that name, then this representation in the application would not be false.   But if it was not his name, and if he intended to conceal his real name and his identity by giving that name, knowing it was false ; that is, if he had not acquired the name of Maurice W. Mansfield in any or all the ways I have stated, nor in any manner, then the statement in this application was false and no recovery can be had upon it."   There was evidence to support the charge, whether the jury found for the plaintiff or the defendant.   Exception was duly taken to that part of the charge whereby the jury was instructed in substance that if they should find that the insured had acquired the name of Maurice W. Mansfield, the statement in the application was not false and to whatever the court said on that subject.

The question presented by this appeal, therefore, is whether

at common law a man can change his name in good faith and for an honest purpose, by adopting a new one and for many years transacting his business and holding himself out to his friends and acquaintances thereunder, with their acquiescence and recognition? A change of name by proceedings under the statute is not involved.

As the common law rests so largely upon the customs of the people, it is often necessary to search the history of remote periods, both in England and in this country, in order to learn its full scope and meaning. While the legal name of a person now consists of a given name, or one given by his parents, and a surname, or one descending from them, history shows that this was not always the case. In the early life of all races surnames were unknown, while given names have been used from the most distant times to identify and distinguish a particular individual from his fellows. In England surnames were unknown until about the tenth century and they did not come into general use or become hereditary until many years later. (8 Nelson's Encyc. 386.) At first they were used, sometimes for an easy method of identification and at others from accident, caprice, taste and a multitude of other causes. Mr. Bardsley in his History of English Surnames gives thousands of instances of change through selection, the action of neighbors in applying descriptive epithets, the use of nicknames and pet names and the gradual development through circumstances and the necessity of identification as population increased. Thus the son of John or Peter became known as John's son or Peter's son and finally as Johnson or Peterson, aside from his given name. It is well known that the word meaning "son" in different languages, such as Fitz and Mac, was prefixed to the Christian name of the father to give the son a surname and "O" to give one to the grandson, and thus we have the names Fitz-Gerald, MacDonough, O'Brien and many others. The place of birth or residence, the name of an estate, the business pursued, physical characteristics, mental or moral qualities and the like, were turned into surnames. It is to be noted, how-

. . ever, that the surname in its origin was not as a rule inherited from the father, but either adopted by the son, or bestowed upon him by the people of the community where he lived. (Dudgeon's Origin of Surnames, 252.) Father and son did not always have the same surname and it was not regarded as important, for both ·frequently had more than one. Coke wrote in the forepart of the seventeenth century : "Special heed is to be taken of the name of baptism as a man cannot have two, though he may have divers surnames." (Coke Lit. [1st Am. ed.] 3, a. m.)

So in *Button* v. *Wrightman* (Popham's Reports, 56), the learned chief justice and reporter said : "Anciently men took most commonly their surnames from their places of habitation, especially men of estate, and artisans often took their names from their arts, but yet the law is not so precise in the case of surnames and, therefore, a grant made by or to John, son and heir of I. C. or *filio juniori*, I. S. is good, but for the Christian name, this always ought to be perfect."

Camden mentions a man with eight sons, each with a different surname and not one with that of his father. ˙(Camden's Remains, 141.) In a scholarly opinion by Chief Judge DALY, to which we are much indebted, many instances are mentioned where the color of the individual as White, Black or Brown, his height or strength, as Little, Long, Hardy or Strong; mental or moral attributes as Good, Wiley, Gay, Moody or Wise, fixed the surname. (*In re Snook*, 2 Hilt. 566.)

The learned judge continued : "The surname was frequently a chance appellation, assumed by the individual himself, or given to him by others, for some marked characteristic, such as his mental, moral or bodily qualities, some peculiarity or defect, or for some act he had done which attached to his descendants, while sometimes it did not. * * * It was in this way that the bulk of our surnames, that are not of foreign extraction, originated and became permanent. They grew into general use, without any law commanding their adoption, or prescribing any course or mode respecting them; * * * but though the custom is widespread and universal

for all males to bear the names of their parents, there is nothing in law prohibiting a man from taking another name if he chooses. There is no penalty or punishment for so doing, nor any consequence growing out of it, except so far as it may lead to or cause a confounding of his identity."

. The history of literature and art furnishes many examples of men who abandoned the name of their youth and chose the one made illustrious by their writings or paintings. Melanchthon's family name was Schwartzerde, meaning black-earth, but as soon as his literary talents developed and he began to forecast his future he changed it to the classical synonym by which he is known to history.

Rembrandt's father had the surname Gerretz, but the son, when his tastes broadened and his hand gained in cunning, changed it to Van Ryn on account of its greater dignity.

A predecessor of Honoré de Balzac was born a Guez, which means beggar, and grew to manhood under that surname. When he became conscious of his powers as a writer he did not wish his works to be published under that humble name, so he selected the surname Balzac from an estate that he owned. He made the name famous, and the later Balzac made it immortal.

Voltaire, Molière, Dantè, Petrarch, Richelieu, Loyola, Erasmus and Linnæus were assumed names. Napoleon Bonaparte changed his name after his amazing victories had lured him toward a crown and he wanted a grander name to aid his daring aspirations. The Duke of Wellington was not by blood a Wellesley but a Colley, his grandfather, Richard Colley, having assumed the name of a relative named Wesley, which was afterward expanded to Wellesley. (S. Baring-Gould's Famous Names and Their Story, 391.) This author in his chapter on Changed Names gives many examples of men well known to history who changed their names by simply adopting a new one in place of the old.

Mr. Walsh, in his Handbook of Literary Curiosities, makes an interesting statement at page 778: "Authors and actors know the value of a mouth-filling name. Herbert Lythe

becomes famous as 'Maurice Barrymore, Bridget O'Toole charms an audience as Rosa d'Erina, John H. Broadribb becomes Henry Irving. Samuel L. Clemens and Charles R. Browne attract attention under the eccentric masks of Mark Twain and Artemus Ward. John Rowlands would never have become a great explorer unless he had first changed his name to Henry M. Stanley. James B. Matthews and James B. Taylor might have remained lost among the mass of magazine contributors but for their cunning in dropping the James and standing forth as Brander Matthews and Bayard Taylor. Would Jacob W. Reid have succeeded as well as Whitelaw Reid?" While some of these names were merely professional pseudonyms, others were adopted as the real name and in time became the only name of the person who assumed it.

Many other instances of voluntary change of name, both given and surname, might be added, but we will mention only two more. In Larke's "General Grant and His Campaigns" (p. 13) it is stated, and the fact is well known, that "General Grant's baptismal name was Hiram Ulysses and he bore that appellation until he was appointed a cadet at West Point. General Hamer, who nominated him for a cadetship, by some means got his name mixed up with that of his brother. He was, therefore, appointed as 'Ulysses Sidney Grant,' and that name once so recorded on the books of the military academy could not be changed. He was baptized into the military school as U. S. Grant and he has ever since been thus designated."

Another instance, equally well established by current history, is that of President Cleveland, who had the baptismal name of Stephen G. Cleveland. After he entered his teens he omitted the word "Stephen" and assumed the name of Grover Cleveland, by which he was known throughout his distinguished career.

Out of the groundwork of custom, as shown by the early history of the subject, the common law sprang and was gradually developed. The ancient custom was for the son to adopt

a surname at will, regardless of that borne by his father, and the practice, continued occasionally until the present time, has extended to the given name also. If the insurance policy in question had been issued, under the same circumstances, to General Grant or President Cleveland, would it have been valid? Indeed, it may well be asked, would it have been valid if issued to either of those noted men, had it followed the name given at birth instead of the one acquired by adoption and by which they were known while filling the most exalted positions and will be known for all time?

There are but few decisions directly in point, although there are many dicta by eminent judges recognizing as an established rule that a man may change his name, Christian, surname, or both, without resort to legal proceedings.

In *Doe ex dem. Luscombe* v. *Yates* (5 Barn. & Ald. 544) there was a devise of an estate to one Manning, provided within three years after entering into possession he should procure his name " to be altered and changed to my name of Luscombe, by act or acts of Parliament, or some other effectual way for that purpose," and in default of thus changing his name the devise was to become void. Without applying to Parliament for an act of relief or to the king for a license, he adopted the name of Luscombe, and used it for all purposes to the exclusion of his former surname. It was held that he was entitled to retain the estate, the court through Chief Justice ABBOTT saying: " A name assumed by the voluntary act of a young man at his outset into life, adopted by all who knew him and by which he is constantly called, becomes for all purposes that occur to my mind as much and effectually his name as if he had obtained an act of Parliament to confer it upon him."

In *Laflin & Rand Co.* v. *Steytler* (146 Pa. St. 434) an act authorizing the formation of limited partnerships required the articles of association to " set forth the full names of " the members. The adopted name of one of the partners was given as his full name, and an attempt was made to hold the special partners liable as general partners for that reason.

The court defeated the effort and, in discussing the question, said: " A man's name is the designation by which he is distinctively known in the community. Custom gives him the family name of his father and such præenomina as his parents choose to put before it, and appropriate circumstances may require Sr. or Jr. as a further constituent part, but all this is only a general rule from which the individual may depart if he chooses. The legislature in 1852 provided a mode of changing the name, but that act was in affirmance and aid of the common law, to make a definite point of time at which a change shall take effect. Without the aid of that act, a man may change his name or names, first or last, and when his neighbors and the community have acquiesced and recognized him by his new designation, that becomes his name."

The case last cited was soon followed by another in the same court to the effect that the requirement of the statute as to " full names " was " met by giving the names in the form habitually used by those persons in business and by which they are generally known in the community." (*Gearing* v. *Carroll*, 151 Pa. St. 79, 84. See, also, *England* v. *New York Pub. Co.*, 8 Daly, 375, 381; *Cooper* v. *Burr*, 45 Barb. 9, 34; *Bell* v. *Sun Printing & Pub. Co.*, 42 N. Y. Super. Ct. 567, 569; *City Council* v. *King*, 4 McCord, 487; *Hommel* v. *Devinney*, 39 Mich. 522; *Binfield* v. *State*, 15 Neb. 484; *Linton* v. *First National Bank*, 10 Fed. Rep. 894; *The King* v. *Inhabitants of Billingshurst*, 3 Maule & S. 250.)

The elementary writers are uniform in laying down the rule that at common law a man may change his name at will.

Mr. Throckmorton, in his article on Names in the Cyclopedia of Law and Procedure, says: " It is a custom for persons to bear the surnames of their parents, but it is not obligatory. A man may lawfully change his name without resort to legal proceedings, and for all purposes the name thus assumed will constitute his legal name just as much as if he had borne it from birth." (29 Cyc. 271.)

So a writer in the American & English Encyclopædia of Law says: "At common law a man may lawfully change his

name, or by general usage or habit acquire another name than that originally borne by him, and this without the intervention of either the sovereign, the courts, or Parliament; and the common law, unless changed by statute, of course obtains in the United States." (21 Am. & Eng. Encyc. of Law [2d ed.], 311.)

" One may legally name himself, or change his name, or acquire a name by reputation, general usage, and habit." (2 Fiero Sp. Pro. [2d ed.] 847.)

The subject is not affected by the various statutes, commencing in 1847 and continuing with some expansion and changes to the present time, whereby a change of name is authorized by judicial proceedings. (L. 1847, ch. 464; Code Civ. Pro. §§ 2410–2415.) As was said by the Supreme Court of Pennsylvania of a similar statute in that state, this legislation is simply in affirmance and aid of the common law to make a definite point of time when the change shall take effect. (*Laflin & Rand Co.* v. *Steytler, supra.*) It does not repeal the common law by implication or otherwise, but gives an additional method of effecting a change of name. The statutory method has some advantages, because it is speedy, definite and a matter of record, so as to be easily proved even after the death of all contemporaneous witnesses. In one respect, however, the statute may limit the common-law right, in that it provides that on and after the day specified in the order of the court for the change to take effect, the applicant shall " be known by the name which is thereby authorized to be assumed, and by no other name." (Code Civ. Pro. § 2415.) It may well be, therefore, that after a man has acquired a name by judicial decree, he cannot acquire another without resorting to the courts.

The other questions discussed by counsel have also been examined, but we find none requiring reversal and the judgment should, therefore, be affirmed, with costs.

CULLEN, Ch. J., GRAY, EDWARD T. BARTLETT, HAIGHT, WILLARD BARTLETT and CHASE, JJ., concur.

Judgment affirmed.