SECRETARY OF THE COMMONWEALTH & another[1] *vs.*
CITY CLERK OF LOWELL & others.[2]

Suffolk.    May 5, 1977. — August 4, 1977.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, WILKINS,
LIACOS, & ABRAMS, JJ.

*Name.    Parent and Child.    Vital Statistics.    Municipal Corporations,*
    Clerk's records.    *City and Town Clerks.*

Discussion of the right at common law to change one's surname.  [183]
Discussion of Commonwealth statutes affecting surnames.  [183-185]
Discussion of recent legal developments with respect to freedom of
    choice in the matter of names.  [185-187]
A woman, regardless of her marital status, may change her name at
    will, without resorting to legal proceedings, provided it is done for
    an honest purpose.  [187-189]

---

[1] The Registrar of Vital Records and Statistics. The action was begun by the Secretary of State and the Acting Registrar of Vital Statistics. By St. 1976, c. 486, effective January 1, 1977, the division of vital
statistics was transferred from the office of the Secretary of State to
the Department of Public Health. Substitution of parties is automatic
under Mass. R. Civ. P. 25 (d) (1), 365 Mass. 771 (1974).

[2] Registrar of the city of Boston and clerks of the cities of Worcester,
Newburyport and Melrose and the town of Brookline.

Secretary of the Commonwealth *v.* City Clerk of Lowell.

A married couple may give their legitimate child the surname of their choice. [189-190]
A mother may choose the surname to be given to her illegitimate child; this court, however, reserved the question whether the mother of an illegitimate child may give him substantially the same name as the putative father's. [190-192]
In recording births and marriages municipal clerks have no power to determine people's surnames according to customary rules, but must record the name chosen by the individual concerned. [193] QUIRICO, J., dissenting, with whom LIACOS, J., joined.

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on July 28, 1976.

The case was reserved and reported by *Kaplan, J.*

*Barbara J. Rouse,* Assistant Attorney General, for the plaintiffs.

*David Lee Turner,* Town Counsel, for the Town Clerk of Brookline (*Henry P. Grady,* City Solicitor, for the City Clerk of Worcester, with him).

*Donald L. Conn & James R. Senior,* for the City Clerk of Melrose, submitted a brief.

BRAUCHER, J. In 1974 the Attorney General issued three opinions with respect to the recording and use of names. Rep. A.G., Pub. Doc. No. 12, at 105 (1974). Rep. A.G., Pub. Doc. No. 12, at 48 (1974). Rep. A.G., Pub. Doc. No. 12, at 72 (1974). Those opinions asserted and elaborated a common law principle that people may select or change their names freely if there is no fraudulent intent. The defendants, city and town clerks, refused to follow those opinions and that principle in recording births and marriages, asserting a power to determine people's surnames according to customary rules, regardless of the desires of the people concerned. The responsible State officials, particularly the Registrar of Vital Records and Statistics (Registrar), brought this action to settle the controversy. We hold that the Attorney General is right and the city and town clerks are wrong, and order that the rights of the parties be declared accordingly.

The plaintiffs filed a complaint on July 28, 1976, in the Supreme Judicial Court for the county of Suffolk. On August 16, 1976, a single justice of this court denied the plain-

tiffs' prayer for a preliminary injunction, without prejudice to further application if the action was certified as a class action, but granted temporary relief in seven specific cases alleged in the complaint and supported by affidavits. Answers were filed and the plaintiffs moved to certify a class of defendants comprising all the city and town clerks in the Commonwealth. Decision on that motion was deferred and the case continued to give the parties an opportunity to file a statement of agreed facts and a proposed reservation and report. On January 6, 1977, no statement of agreed facts having been filed, the plaintiffs moved for summary judgment, attaching affidavits alleging ten additional specific cases in Boston and one in Northampton. A stipulation of facts was filed on February 4, 1977, and on February 17, 1977, a single justice of this court reserved and reported the case on the stipulation, the pleadings, the motion for certification and the motion for summary judgment.

We summarize the stipulated facts, omitting statements of law. Only initials of surnames are given. (1) Mr. C and his wife Ms. G selected the name G for their son in accordance with Spanish tradition. The mother, unable to read English, signed a birth certificate using the name C. One of the defendants recorded the name as C and refused to change it. (2) Mr. B and his wife Ms. S submitted a birth certificate for their son using the name B-S, and one of the defendants refused to accept it. (3) Ms. S. chose the name P-S for her illegitimate son. Without her approval, one of the defendants recorded the name as S and refused to change it. (4) The illegitimate daughter of Ms. G was recorded as G. When Ms. G married the father, Mr. L, five years later, one of the defendants refused to register legitimation unless the child's surname was changed to L, and insisted that the affidavit of paternity list the mother's name as L, although she had not adopted her husband's name. (5) Ms. L was divorced from Mr. L and resumed her maiden name McC. Two of the defendants refused to issue a marriage license to her in the name McC, and she received and used a marriage license in the name L, the

name on her divorce decree. She and her husband both took the name McC-M, and a third defendant refused to register the legitimation of their daughter unless the child's name was changed from McC to M. (6) Mr. D and his wife Ms. D selected the surname F for their daughter. One of the defendants refused to accept that name for registration and instead recorded the birth under the name D. (7) Ms. N sought to name her illegitimate daughter D. One of the defendants refused to record the birth in that name.

On January 14, 1976, the Massachusetts City Clerks' Association, Inc., unanimously adopted the formal position that legitimate births would only be recorded in the surname of the father and illegitimate births in the surname of the mother. This has been the custom and usage in Massachusetts for over 200 years with respect to the recording of births by city and town clerks. Over the past several years there have been increases in the number of parents requesting the recording of births in other surnames. City and town clerks customarily do not change a name on a birth or marriage record except by court order or pursuant to specific statutory provisions. City and town clerks are requested, on a continuing and regular basis, and are required to furnish certified copies of birth and marriage certificates to citizens so that they may use them in obtaining passports, public assistance, inheritance claims, social security, drivers' licenses, insurance and other benefits, registering a child for school and registering to vote, enforcing support obligations, establishing identification and family relationships, and for many other purposes. If a birth or marriage is not recorded, such certified copies cannot be furnished.

1. *Duties of the parties.* The Secretary of State is charged by the Constitution with responsibility for keeping the records of the Commonwealth. Mass. Const. Part II, c. 2, § 4, art. 2. The Registrar, under the supervision of the Commissioner of Public Health (Commissioner), is to "enforce all laws relative to the registry and return of births, marriages and deaths, and may prosecute in the

name of the commonwealth any violations thereof." G. L. c. 17, § 4, as amended through St. 1976, c. 486, § 3. Such laws are the subject of G. L. c. 46, as amended through St. 1976, c. 486. The city and town clerks are to "receive or obtain and record" prescribed facts relative to births, marriages and deaths, and are periodically to transmit to the Commissioner "upon forms furnished by him" certified copies of the record. §§ 1, 17. The record of the city or town clerk is prima facie evidence of the facts recorded, and a certificate of the Commissioner's copy, signed by the Commissioner or the Registrar, is admissible as evidence of the record. § 19.

In birth records, the facts to be recorded include "name of child" and "names, places of birth and residence of his parents, including the maiden name of the mother and occupation of the father. In the record of birth of an illegitimate child, the name of and other facts relating to the father shall not be recorded *except on the written request of both father and mother*."[3] In marriage records, the facts to be recorded include "names and places of birth of the parties married," "the names of their parents, and the maiden names of the mothers. If the woman is a widow or divorced, her maiden name shall also be given." G. L. c. 46, § 1. As to a birth in a hospital, the physician or hospital medical officer in charge is to keep a record and file a report with the administrator or person in charge of the hospital, and the latter is to make a copy, "on forms prepared and furnished by the commissioner of public health," and file the copy with the city or town clerk. The copy is to be "signed by the mother or if she is not able then by the father or other responsible adult, attesting to the truth and accuracy of the facts appearing in the record." §§ 3, 3A. The clerk is to determine that the return is filled out in accordance with § 3; if there are deficiencies or omissions, he is to return it for correction or completion. § 4A.

"The municipal clerk," the defendants say, "must have

---

[3] The italicized words were inserted by St. 1977, c. 161, effective August 3, 1977.

the skills of Sherlock Holmes and the wisdom of Solomon."
We do not quarrel with that assertion, but it does not
extend to the decision of questions of law. When the Regis-
trar has obtained the advice of the Attorney General on a
question of law, and the Registrar has informed the clerk
of the result, it is no part of the duty of the clerk to substi-
tute his legal judgment for that of the Attorney General.
Nor do we think the clerk has any general duty to investi-
gate facts reported to him in proper form or to resolve
factual disputes. In certain cases he has some discretion;
by § 13, for example, he is given special responsibilities
with respect to credibility in the correction of errors in the
record and in cases of legitimation or adoption. Otherwise,
however, he must inevitably rely on facts supplied by the
parties.

2. *Surnames at common law.* "It is well settled that at
common law a person may change his name at will, with-
out resort to legal proceedings, by merely adopting another
name, provided that this is done for an honest purpose."
*Merolevitz, petitioner*, 320 Mass. 448, 450 (1946), and cases
cited. This principle was recognized by this court very
early: "... we know not why corporations may not be
known by several names as well as individuals." *Minot* v.
*Curtis*, 7 Mass. 441, 444 (1811). "Where a person is in fact
known by two names, either one can be used. This princi-
ple has been applied in about every connection." *Young* v.
*Jewell*, 201 Mass. 385, 386 (1909), and cases cited. Numer-
ous authorities in other jurisdictions are in accord. See
*Smith* v. *United States Cas. Co.*, 197 N.Y. 420, 423-429
(1910), and cases cited.

3. *Statutes affecting surnames.* Statute 1849, c. 141,
empowered the judge granting a divorce decree to a mar-
ried woman "to allow said woman to resume her maiden
name." See G. L. c. 208, § 23, as appearing in St. 1973,
c. 379, which permits a woman to resume her maiden name
or the name of a former husband, regardless of who ob-
tained the divorce. "The first statute enacted in this Com-
monwealth allowing a change of name by judicial decree
was St. 1851, c. 256, § 1." *Merolevitz, petitioner*, 320 Mass.

448, 449 (1946). Cf. G. L. c. 210, § 12. By St. 1871, c. 310, § 7, a court making a decree of adoption might "also decree such change of name as the petitioner may pray for." Cf. G. L. c. 210, § 6. See *Curran, petitioner,* 314 Mass. 91, 95-96 (1943).

Those statutes might have been read to limit the common law principle of free choice in the matter of name. Indeed, in *Bacon* v. *Boston Elevated Ry.,* 256 Mass. 30, 32 (1926), we relied on G. L. c. 208, § 23, for the proposition that after Alice W. Willard married Walter O. Bacon her "legal name," as matter of law, was Alice W. Bacon. The result was that her automobile was improperly registered and was a trespasser on the highway; it also appeared that she was generally known as Alice W. Bacon. Later cases made it clear that registration in the name Mrs. Walter O. Bacon or in another name by which she was generally known would have been proper. *Koley* v. *Williams,* 265 Mass. 601, 603 (1929) (Mrs. John P. Williams). *Bridges* v. *Hart,* 302 Mass. 239, 245 (1939) (Theophilus Doucette, generally known as Thomas Douey). *Korsun* v. *McManus,* 318 Mass. 642, 645 (1945) (unmarried woman generally known by surname of supposed husband). In any event, the doctrine of trespass by improper registration was later abolished. G. L. c. 90, § 9. See *Green* v. *Commissioner of Corps. & Taxation,* 364 Mass. 389, 393 (1973).

In *Merolevitz, petitioner,* 320 Mass. 448, 450 (1946), we said, "In jurisdictions where this subject has been regulated by statute, it has generally been held that such legislation is merely in aid of the common law and does not abrogate it. [Citations omitted.] We assume, in view of the wording of our statute (G. L. [Ter. Ed.] c. 210, § 12), that it provides the only method by which one can change his name with legal effect. But it does not follow that one may not assume or use another name without resort to the statute if such use is for an honest purpose." We have since adhered to this view. *Buyarsky, petitioner,* 322 Mass. 335, 338 (1948): "The common law recognizes his freedom of choice to assume a name which he deems more appropriate

and advantageous to him than his family name in his present circumstances, if the change is not motivated by fraudulent intent." *Mark* v. *Kahn,* 333 Mass. 517, 520-521 (1956). *Rusconi, petitioner,* 341 Mass. 167, 169-170 (1960). So far as our cases suggest that a person has a "legal name" or a name "with legal effect," different from the name he has lawfully chosen, those suggestions were not necessary to decision.

Under G. L. c. 46, § 1, the city or town clerk is to record in the record of births and marriages the "names" of various persons. No rule is laid down by which to determine any "name." In these circumstances we are remitted to the common law or to governing statutes to determine what is a "name." No tradition of city and town clerks can override the law or the rights of the people.

4. *Recent developments.* In applying the common law to an unprecedented situation, we may properly inquire whether the traditional rule is suited to present conditions. We therefore take note of a number of recent legal developments which, though not directly controlling, contribute to the setting in which the questions now before us arise. We have been authoritatively advised that freedom of personal choice in matters of family life is one of the liberties protected by the due process clause of the Fourteenth Amendment, and that there is a private realm of family life which the State cannot enter. *Smith* v. *Organization of Foster Families for Equality and Reform,* 431 U.S. 816, 842-847 (1977), and cases cited. Important changes in popular and legal thinking suggest that ancient canards about the proper role of women have no place in the law. *Surabian* v. *Surabian,* 362 Mass. 342, 348 n.7 (1972). As amended by art. 106 of the Amendments, adopted in November, 1976, art. 1 of the Massachusetts Declaration of Rights provides, "Equality under the law shall not be denied or abridged because of sex."

Parents' claim to authority in their own household to direct the rearing of their children is basic to the structure of society; the custody, care and nurture of the child reside first in the parents, whose primary function and freedom

include preparation for obligations the State can neither supply nor hinder. *Carey* v. *Population Servs. Int'l,* 431 U.S. 678, 707-708 (1977) (Powell, J., concurring), and cases cited. At the same time minors, as well as adults, are protected by the Constitution and possess constitutional rights. *Id.* at 691-693 (opinion of Brennan, J.), and cases cited. In particular, classifications based on illegitimacy, though not subject to "strictest scrutiny," are subject to a scrutiny under the equal protection clause which is "not a toothless one." *Trimble* v. *Gordon,* 430 U.S. 762, 767 (1977), and cases cited.

More directly relevant is the enactment of G. L. c. 151B, § 4, cl. 15, by St. 1975, c. 84, and c. 367, § 3, under which it is "an unlawful practice: ... 15. For any person responsible for recording the name of or establishing the personal identification of an individual for any purpose, including that of extending credit, to require such individual to use, because of such individual's sex or marital status, any surname other than the one by which such individual is generally known." We have no doubt that a city or town clerk recording a birth or marriage is a "person responsible for recording the name of ... an individual" within the meaning of that statute. It is stipulated that one of the defendants required that Ms. G use on an affidavit of paternity, because of her sex and marital status, the name L, a name other than the one by which she was generally known. Similarly, two of the defendants required Ms. McC to use on her marriage license, because of her sex and marital status, the name L, a name other than the one by which she was generally known. But the present action has not followed the statutory procedure. G. L. c. 151B, §§ 1-9. Compare *East Chop Tennis Club* v. *Massachusetts Comm'n Against Discrimination,* 364 Mass. 444, 453 (1973), with *Trustees of Tufts College* v. *Volpe Constr. Co.,* 358 Mass. 331, 340 (1970), and *Black* v. *School Comm. of Malden,* 365 Mass. 197, 202-203 (1974). We therefore do not decide the case under the statute. But we think we may take into account the policy embodied in the statute.

All these recent developments seem to us to indicate

strongly that the common law principle of freedom of choice in the matter of names is not out of harmony with modern conditions.

5. *Names of married and divorced women.* It follows from what we have said that a woman, like a man, may change her name at will, without resorting to legal proceedings, provided that this is done for an honest purpose. We illustrate with situations presented in the present case. When Jane Doe marries Richard Roe she may, but need not, assume the name Jane Roe and at the same time the name Mrs. Richard Roe. She is also free to retain the name Jane Doe or to assume some other name chosen by her, such as Jane Roe-Doe or Jane Doe-Roe. It has been held that such freedom of choice is not compelled by the United States Constitution. *Forbush* v. *Wallace,* 341 F. Supp. 217, 222 (M.D. Ala. 1971), aff'd on appeal, 405 U.S. 970 (1972) (driver's license). But the results indicated accord with the overwhelming weight of recent authority in other States. *Davis* v. *Roos,* 326 So. 2d 226, 229 (Fla. Dist. Ct. App. 1976) (maiden name on driver's license). *In re Natale,* 527 S.W.2d 402, 404-405 (Mo. App. 1975) (court order for change to name of choice). *In re Lawrence,* 133 N.J. Super. 408, 412-414 (1975) (court order for change to maiden name). *Dunn* v. *Palermo,* 522 S.W.2d 679, 688 (Tenn. 1975) (registration in maiden name). *In re Strikwerda,* 216 Va. 470, 472 (1975) (court order for change to maiden name). *Doe* v. *Dunning,* 87 Wash. 2d 50, 53 (1976) (right to use maiden name). *Kruzel* v. *Podell,* 67 Wis. 2d 138, 152 (1975) (same). See Annot., 67 A.L.R.3d 1266 (1975). But cf. *In re Mohlman,* 26 N.C. App. 220, 228 (1975) (no sufficient reason for ordering change to maiden name). We note that the husband may retain the name Roe or may assume the name Doe or some other name, whether or not his wife assumes the same name.

Similarly, on divorce from Richard Roe, with or without a court order as to her name, Jane Roe may retain that name or resume the name Jane Doe as her maiden name or the name of a previous husband, or she may assume a new

name. Like G. L. c. 210, § 12, so also G. L. c. 208, § 23, does not restrict her choice but aids her to secure an official record that definitely and specifically establishes her change of name. See *Buyarsky, petitioner,* 322 Mass. 335, 338 (1948). It seems unlikely that after divorce she would desire to retain the name Mrs. Richard Roe; no such case is presented to us, and we do not pass on such a case. Cf. *Wilty* v. *Jefferson Parish Democratic Executive Comm.,* 245 La. 145, 167 (1963) (husband and estranged wife as candidates for election to same office).

When a woman's "name" is to be recorded on a birth or marriage record, the name to be recorded is the name chosen by her. See *Custer* v. *Bonadies,* 318 A.2d 639, 644 (Conn. Supp. 1974) (voting); *Stuart* v. *Board of Supervisors,* 266 Md. 440, 449 (1972) (same). When her "maiden name" is to be recorded, it is the name used by her before her first marriage. Inevitably the city or town clerk must rely on information supplied by her. If a certificate of divorce submitted under G. L. c. 207, § 21, shows a different name from that shown in a notice of intention of marriage, G. L. c. 207, § 35, authorizes the clerk to require a deposition under oath to prove the facts.

The defendants argue that under present practice "it is possible to trace ancestral chains because all changes in names are noted on the official record," and that the use of names of choice will make it "impossible or at best practically impossible to trace ancestral chains, even with the best of index." Similar arguments have been rejected elsewhere. *In re Halligan,* 46 App. Div. 2d 170, 172 (N.Y. 1974). *Dunn* v. *Palermo,* 522 S.W.2d 679, 688 (Tenn. 1975). Not all changes in men's names are noted on any public record. The birth certificates in the record before us show the father's name, birthplace and age, but not the date or place of his marriage; there is no cross-reference to his birth or marriage record, and no assurance that he bore the same name at birth or on his marriage, either or both of which may have taken place outside Massachusetts. In practice the supposed ease of tracing ancestral chains is often a chimera.

We recognize that a foolish choice of name may have undesired consequences. "But freedom to choose is freedom to choose foolishly." *Hershkoff* v. *Registrars of Voters of Worcester,* 366 Mass. 570, 578 (1974) (choice of domicil). City and town clerks are not empowered to prevent such folly. In argument the defendants disclaimed any right to review first or middle names. Neither the common law nor our statutes give them any greater right to review surnames.

6. *Names of legitimate children.* There is no statutory provision as to the parents' choice of a child's surname. We read the reference in G. L. c. 46, § 4A, to the "family name," to be reported by the city or town clerk to the local board of health, as referring merely to the child's surname. Judicial decisions on the matter are sparse. We put to one side cases of disputes between parents. See *Fuss* v. *Fuss (No. 1),* 372 Mass. 64, 69 (1977); *Mark* v. *Kahn,* 333 Mass. 517, 521-522 (1956); Annot., 53 A.L.R.2d 914 (1957). Nor do we consider the possible claim of a "mature minor," since no such claim is included in the record before us. See *Baird* v. *Attorney Gen.,* 371 Mass. 741, 749-755 (1977).

There has unquestionably been a widespread custom in this country to give a child the surname of its father. See *Smith* v. *United States Cas. Co.,* 197 N.Y. 420, 423-425 (1910); *Kay* v. *Bell,* 95 Ohio App. 520, 524 (1953); *Roberts* v. *Mosier,* 35 Okla. 691, 695 (1913). Consistently with what we have said above, we think this has been a matter of parental choice rather than a matter of law. We once assumed that "the right to name a child belongs to its parents, and ultimately to its father." *Eaton* v. *Libbey,* 165 Mass. 218, 220 (1896). A father with no adverse interest may as next friend assert legal rights on behalf of his minor children. *Stevens* v. *Cole,* 7 Cush. 467, 469 (1851). Cf. G. L. c. 201, § 34, as appearing in St. 1976, c. 548; Mass. R. Civ. P. 17 (b), 365 Mass. 764 (1974). In several of our cases on change of name the proceeding has been brought by husband and wife and their children. *Rusconi, petitioner,* 341 Mass. 167 (1960). *Buyarsky, petitioner,* 322 Mass. 335 (1948). *Merolevitz, petitioner,* 320 Mass. 448 (1946).

We think the common law principle of freedom of choice in the matter of names extends to the name chosen by a married couple for their child. They may change their own names at will, and need not have the same surname. It seems to us to follow that they need not give their child the father's surname, though of course they may. In *Doe v. Dunning,* 87 Wash. 2d 50, 54 (1976), the court saw "no legal impediment which would prevent married parents from giving the child the mother's surname."

It is a short step to the conclusion that it is proper to record the child's surname as a hyphenated combination of the father's surname and the mother's maiden name, in whichever order they choose. It is less clear that parents are free to select as the name of their child a surname borne by neither of them. In one of the specific cases alleged in the complaint parents named D sought to name their daughter F, and one of the defendants instead recorded her name as D. We think that the principles of freedom of choice and parental control extend to this case also. We note the suggestion of the Attorney General, "in the interest of avoiding confusion and ensuring a minimum of problems in searching for birth records," that the Registrar and the various clerks may wish to utilize their powers by cross-indexing such births under the surnames of the parents. Rep. A.G., Pub. Doc. No. 12, 72, at 73 n.1 (1974).

7. *Names of illegitimate children.* It has been reported that under English law an illegitimate child acquired no name at birth, and could acquire a surname only by reputation. See W. Hooper, Illegitimacy 122-124 (1911). Usually the illegitimate child bears the mother's name, but statutes have sometimes permitted the child to take the father's surname in cases of legitimation or in other defined circumstances. See H.D. Krause, Illegitimacy: Law and Social Policy 32-33 (1971). Cf. *Zepeda* v. *Zepeda,* 41 Ill. App. 2d 240, 255-256 (1963) (statutory right to father's surname); *Baston* v. *Sears,* 15 Ohio St. 2d 166 (1968), reversing 11 Ohio App. 2d 220 (1967) (action for declaratory judgment against putative father dismissed). One court granted

an application for change from Joseph M., the mother's surname, to Joseph F., Jr., where the application was supported by the putative father, Joseph F., and opposed by his wife, Mrs. F. *In re M.*, 91 N.J. Super. 296 (1966). Cf. *In re Biegaj*, 25 N.Y.S.2d 85 (City Ct. 1941), where the court said, after an adjudication of paternity, that the mother had the right to adopt the father's name for herself and the child, but an application for judicial change of name was denied as not in the child's interest. We do not consider any question with respect to a dispute between the parents. Cf. *Gardner* v. *Rothman*, 370 Mass. 79, 81-82 (1976) (visitation rights). Nor do we consider the possible claim of a "mature minor." See *Baird* v. *Attorney Gen.*, 371 Mass. 741, 749-755 (1977).

Our own decisions are inconclusive. In *Curran, petitioner*, 314 Mass. 91, 95-96 (1943), we held that an unmarried woman might adopt her illegitimate child and obtain a decree changing his surname from that of the putative father to that of the mother: "The name requested seems to be an appropriate name to be borne by the child after the adoption. It will serve no useful purpose to enter upon a discussion as to the present legal name, if any, of the child." We have consistently recognized the mother's right to custody and control of her illegitimate child and her duty to support him, as his natural guardian. See *Commonwealth* v. *MacKenzie*, 368 Mass. 613, 617 (1975); *Commonwealth* v. *Hall*, 322 Mass. 523, 528 (1948), and cases cited; Note, 6 Suffolk U.L. Rev. 58, 74-78 (1971). We think it follows that, at least in the absence of objection from the putative father, she has, in general, the same right to control the initial surname of the child as the parents of a legitimate child.

We reserve for another day the question whether, in the absence of a written request of both father and mother, the mother of an illegitimate child may give him substantially the same name as his putative father's, for example, his father's entire name followed by "Junior." Under G. L. c. 46, § 1, the record of birth of an illegitimate child in such a case is not to include the name of the father or

other facts relating to the father. "As a practical matter," say the defendants, "the statute precludes the registration of a surname of an illegitimate child in any name other than that of the mother." We disagree. But we leave open the possibility that, in some circumstances, the name of the child might be used to evade the statutory prohibition against naming the father. If there has been no consent of the father, no acknowledgment of paternity by him, and no adjudication of paternity, there is also the possibility of a dishonest purpose to harass the alleged father. The plaintiffs seem to suggest that the statute is unconstitutional by reason of an invidious discrimination between legitimate children and illegitimate children. None of these questions is properly presented by the pleadings and the stipulation of facts, and none of them is adequately argued.

Under G. L. c. 190, § 7, as amended by St. 1943, c. 72, § 1, if the parents of an illegitimate child intermarry and if the father either acknowledges paternity or has been adjudged the father under G. L. c. 273, the child "shall be deemed legitimate and shall be entitled to take the name of his parents to the same extent as if born in lawful wedlock." In such a case G. L. c. 46, § 13, as amended through St. 1976, c. 486, § 10, provides that the record of the child's birth shall be amended or supplemented so as to read like that of a child born legitimate. The facts are to be proved by affidavits. The clerk must be "satisfied as to the identity of the persons and the facts"; in certain cases there must be "evidence substantiating such facts beyond all reasonable doubt," and the affidavits and evidence are to be approved by a judge of probate or a judge of a District Court. Nothing in these statutes requires or forbids any change of name on the part of either parents or child, and we hold that the principles of freedom of choice and parental control are in no way limited. Neither the city or town clerk nor the approving judge or justice may properly insist that any of the parties retain or assume any particular name.

8. *Correction of records.* Except as provided by statute, city and town clerks have no right or duty to change a birth or marriage record to reflect events after the record is made. But if the record does not contain all the required facts, or if the facts are not correctly stated in the record, G. L. c. 46, § 13, provides for proof by affidavit and documentary evidence, filing and recording of the affidavit, correction of the record, forwarding of a certified copy of the corrected record to the city or town clerk of the parents' residence at the time of birth and to the Commissioner, and correction of their records. In most of the specific cases referred to in the complaint and in the stipulation of facts, corrections have presumably been made in accordance with the interlocutory order of the single justice, and those corrections should stand. Other specific cases, including those referred to in the plaintiffs' motion for summary judgment, should now be considered or reconsidered in accordance with this opinion. There is no duty on the part of city or town clerks to seek out people who have been aggrieved by their past decisions, but they may informally assist those of whom they are currently aware to take corrective steps.

9. *Disposition.* A judgment is to be entered in the county court declaring the rights of the parties in accordance with this opinion. Injunctive relief is to be denied because we assume that the declaratory judgment will be sufficient to accomplish compliance by the defendants and others similarly situated. The motion to certify a class of defendants and the motion for summary judgment are denied. The temporary relief granted by the single justice will terminate on entry of the declaratory judgment. See *Harborview Residents' Comm., Inc.* v. *Quincy Hous. Auth.,* 368 Mass. 425, 433 (1975).

*So ordered.*

QUIRICO, J. (dissenting, with whom Liacos, J., joins). I readily recognize and acknowledge, as does the court in

its opinion, that at common law a person (a) "may change his name at will, without resort to legal proceedings, by merely adopting another name, provided that this is done for an honest purpose" (*Merolevitz, petitioner*, 320 Mass. 448, 450 [1946]), and (b) has the "freedom of choice to assume a name which he deems more appropriate and advantageous to him than his family name in his present circumstances, if the change is not motivated by fraudulent intent." *Rusconi, petitioner*, 341 Mass. 167, 169-170 (1960). However, in my opinion, this common law right cannot and does not override or render unenforceable the statutory mandate for the making and keeping of the many important public records involved in this case, nor does it give the persons to whom those records relate the right or option to determine and dictate, at their discretion, the names and other information required by statute to be entered on those records.

The Legislature, in the exercise of its "full power and authority . . . to make, ordain, and establish, all manner of wholesome and reasonable orders, laws, statutes, and ordinances, directions and instructions . . . as . . . [it] shall judge to be for the good and welfare of this Commonwealth, and for the government and ordering thereof, and of the subjects of the same" (Mass. Const. Part II, c. 1, § 1, art. 4), has enacted a series of statutes mandating the making and keeping of certain public records containing data relating to the lives of individuals. The records are referred to as "vital records" in G. L. c. 17, § 4, as amended through St. 1976, c. 486, § 3.

The principal mandated vital records are those relating to a person's birth, adoption, marriage, divorce, change of name by court proceeding, or death. While the initial record of such an event is to be found in the office of a municipal clerk, or of a clerk of court or register of probate in the city or town where it occurred, the statutory scheme requires that the clerk or register send a copy of his record or a report of the happening of the event to the Commonwealth's central "registry of vital records and statistics" under the supervision of the Commissioner of Public

Health. There is also a statutory provision for the completion or correction of such vital records at the local level, with a requirement for the forwarding of any such correction to the central registry.

An examination of the entire statutory scheme on vital records establishes beyond question that the Legislature intended that the vital records show more than the fact that on a certain date and at a certain place a person was born, married, or died. The clear emphasis of the legislation is on the requirement of a record containing accurate information from which it can be determined who was born, married, or died. Each such record must show when the record was made, when and where the recorded event occurred, and who was born, married, or died, as the case may be. G. L. c. 46, § 1, as amended through St. 1977, c. 161. Additionally, the birth record must state the child's "sex, names, places of birth and residence of his parents, including the maiden name of the mother and occupation of the father."[1] The record of a marriage must further state the "name, residence and official station of the person by whom [the marriage was] solemnized, names and places of birth of the parties married, residence of each, age of each, the number of the marriage (as first or second) and if previously married, whether widowed or divorced, the occupation of each and the names of their parents, and the maiden names of the mothers [and i]f the woman is a widow or divorced, her maiden name shall also be given."[2] The same statute requires the following additional information on a death record: "sex, color, condition (whether single, widowed, married or divorced), supposed age, residence, occupation, place of death, place of birth, names and places of birth of the parents, maiden name of the mother, disease or cause of death . . . place of burial, name of the

---

[1] This statute also provides: "In the record of birth of an illegitimate child, the name of and other facts relating to the father shall not be recorded except on the written request of both father and mother."

[2] For yet further record requirements applicable to notices and certificates of intention of marriage, see G. L. c. 207, §§ 19-37.

cemetery, if any [certain information if the deceased was a veteran], and if deceased was a married or divorced woman or a widow, her maiden name and the name of her husband."

Having thus devised and enacted a statutory scheme to ensure the completeness and authenticity of the vital records with which we are dealing, the Legislature took the next logical step by enacting the following pertinent provisions of G. L. c. 46, § 19, as amended through St. 1976, c. 486, § 13: "The record of the town clerk relative to a birth, marriage or death shall be prima facie evidence of the facts recorded, but nothing contained in the record of a death which has reference to the question of liability for causing the death shall be admissible in evidence. A certificate of such a record, signed by the town clerk or assistant clerk, or a certificate of the copy of the record relative to a birth, marriage or death required to be kept in the department of public health, signed by the commissioner of public health or the registrar of vital records and statistics, shall be admissible as evidence of such record."

It is my opinion that when the detailed and comprehensive statutory scheme for the making and keeping of vital records is read in its entirety, the basic intent of the Legislature which permeates this scheme is the following: (1) that on the birth record of a legitimate child the surname of the father shall be entered as the surname of the child, (2) that on the birth record of an illegitimate child the surname of the mother shall be entered as the surname of the child, unless (a) both the father and mother request in writing that the name of the father and other information relating to him be recorded (G. L. c. 46, § 1), in which event the name of the father and such other information shall also be entered on the birth record of the child, and the surname of the father shall be entered thereon as the surname of the child, or (b) the surname of the mother of the illegitimate child having been originally entered on the birth record as the surname of the child, it is subsequently changed to that of the father in any manner from time to time permitted by statute (G. L.

c. 46, § 3, and G. L. c. 190, § 7), and (3) that a child's name and surname (collectively hereafter referred to as "name") shall continue to be the appropriate record name of that person for the purpose of vital records concerning him or her, unless it is lawfully changed of record by or as the result of (a) an adoption accompanied by a change of name (G. L. c. 210, § 6A), (b) a change of name by decree of the Probate Court (G. L. c. 210, §§ 12-13) (c) marriage (see G. L. c. 210, § 12[3]), (d) an order or decree of the Probate Court granting a divorce and allowing "a woman to resume her maiden name or that of a former husband" (G. L. c. 208, § 23, as appearing in St. 1973, c. 379), or (e) a statutorily authorized correction of a name appearing in a record of birth, marriage, or death (G. L. c. 46, § 13).

When the statutory scheme is viewed in historical context, it becomes clear that the Legislature intended the results outlined above. These statutes have their origin in quite detailed colonial laws dating back more than 300 years. The Legislature has codified and amended these statutes at least twenty times over their history. The parties in the present case agree that "custom and usage ... for over two hundred years, with respect to the recording of births by city and town clerks, [has been] to record the birth or birth certificate of a legitimate child in the surname of the father ... [and] of an illegitimate child in the surname of the mother." In the course of its periodic review and modification of these statutes, the Legislature surely considered and acquiesced in this custom and usage. Such acceptance is entitled to considerable weight in assessing the meaning of these statutes.

I would interpret the various statutes relating to vital records in a manner which would give full effect to what I believe to have been the intent of the Legislature.

---

[3] The second sentence of this statute is: "*No change of the name of a person,* except upon the adoption of a child under this chapter or *upon the marriage* or divorce *of a woman,* shall be lawful unless made by said court for a sufficient reason consistent with public interests" (emphasis supplied).

In my view the position taken by the court does not give sufficient weight to the important public interests which are dependent on the proper maintenance of these vital records. Unless these records are consistently kept in a manner which permits ready and reliable determination of the relationship between various persons, particularly between parents and children, between spouses, former spouses and parents of spouses, and between deceased persons and surviving spouses or other heirs, it will become impossible to construct chains of familial relationships on which so many important issues, including the distribution of property of a deceased, may depend. The result reached by the court today in the name of "the common law principle of freedom of choice in the matter of names," if followed by many persons, will certainly undermine those qualities of consistency and reliability which I believe the Legislature thought indispensable to vital records.

There is ample room in our system of law for both the kind of vital records which the Legislature intended and the exercise of the "freedom of choice" which would permit any person to indulge his desire for a different name for himself or his children outside the sphere of vital records. Neither the legal prescription on the contents of vital records, nor the individual freedom of choice of names, need exclude the other.