Meyer, J.
(dissenting). The majority construes the precautionary addendum in a manner inconsistent with its legislative history, its wording and the prior decisions of this court and so strictly as to read it out of Domestic Relations Law § 117 notwithstanding that as to the wills of persons who died prior to March 1, 1964 the Legislature has expressly directed otherwise. It does so by way of affirming the grant of summary judgment, notwithstanding an application by one of the remaindermen for discovery concerning the motivation behind the adoption and change of name of a 32-year-old lawyer by a life tenant who had no natural child, with the result that the adoptee takes the sizeable remainder to the exclusion of the named remaindermen, his mother and aunt. In doing so it countenances a fraud both on the remaindermen and on the power of appointment. Because I cannot accept either the majority’s rulings on the law or its failure to defer its ruling until discovery has taken place, I respectfully dissent.
I
The Domestic Relations Law section concerning the effect of adoption as it existed when Jonathan T. Gardiner died on August 6, 1933 provided that: "The foster parent or parents and the person adopted sustain toward each other the legal relation of parent and child, and have all the rights and are subject to all the duties of that relation, including the right of inheritance from each other * * * but as respects the passing and limitation over of real or personal property dependent under the provisions of any instrument on the foster parent dying without heirs, the person adopted is not deemed the child of the foster parent so as to defeat the rights of remaindermenThe italicized language (known as the "precautionary addendum”) was removed from the section by Laws of 1963 (ch 406), effective March 1, 1964, but section 2 of that *77 chapter specifically provided that "the provisions of this section in force prior to the time this act takes effect shall apply to the wills of persons dying prior to the time this section takes effect * * * with the same force and effect as if they were not hereby amended.” The latter provision was carried forward as Domestic Relations Law § 117 (3), which, so far as here pertinent, reads: "The provisions of law affected by the provisions of this section in force prior to March first, nineteen hundred sixty-four shall apply to the estates or wills of persons dying prior thereto”.
Jonathan Gardiner’s will, executed January 25, 1932, set up separate trusts for his grandnieces, Isabel Gardiner Mairs and Frances Gardiner Collins, and for his grandnephew, Winthrop Gardiner. The trust for Winthrop gave him the income for life and disposed of the remainder upon his death in language quoted in the majority opinion and which need not be repeated here. Winthrop died October 16, 1980, survived by Isabel and Frances and by a nephew, born June 26, 1942 to Isabel and named on his birth certificate Olney Blanchard Mairs III. Olney was adopted by Winthrop and his wife Beth on August 14, 1974, when Olney was 32 years old and more than 40 years after Jonathan’s death, pursuant to an order of the Suffolk County Family Court which changed his name to Olney Mairs Gardiner. Winthrop was survived as well by Darcy, Beth’s daughter,[1] but by no son other than Olney. Beth’s death certificate, which Olney asks that we judicially notice, shows that she died on January 27, 1975 of acute chronic ethanolism. Sixteen days later, on February 12, 1975, Winthrop executed his will, which in item iv referred to the trust created for him by Jonathan’s will "the principal of which upon my death was to pass to my oldest living son” and continued: "I hereby state that my only son is olney mairs gardiner, of 4935 MaConnel Avenue, Los Angeles, California 90066. To the extent that may be necessary for me to exercise the power of appointment in said Paragraph Fourth of said Will, then I do exercise the same and appoint the principal remaining to my said son.”
The issues which divide the court are whether the addendum proscribes Olney taking to the exclusion of the named *78 remaindermen and whether it was within the intention of Jonathan Gardiner that a male relative not a Gardiner by birth could by the mere change of his name qualify himself to take the remainder to the exclusion of the remaindermen. The majority answers that the addendum must be strictly construed and that a male relative named Gardiner does not mean a male relation born with the name Gardiner. Those answers are, for the reasons hereafter set forth, inconsistent, as to the first, with prior decisions of this court, as to the second, with the common law as well as prior New York decisions.
II
Essentially the position of the majority is that the precautionary addendum is to be applied only if absolutely necessary because it is in derogation of public policy and that, in any event, Olney was a male relative bearing the name Gardiner to whom an appointment could be made. It is, however, somewhat difficult to understand how the legislatively declared policy to keep the addendum in force as to wills of persons dying prior to March 1, 1964 "with the same force and effect as if they [the prior provisions of the section] were not hereby amended” can be deemed in derogation of public policy, the Legislature being the primary progenitor of public policy. Nor can the effect of item: iv of Winthrop’s will be divorced from the addendum by reason of the power of appointment for, as the wording of the will makes clear, Winthrop himself regarded the remainder as passing to the adoptee, Olney, as "my only son,” and exercised the power only "[t]o the extent that may be necessary for me to” do so. But whether considered as a matter of the precautionary addendum or of power of appointment law (as to which see III below) the attempt to divert the remainder from Isabel and Frances, remaindermen named by the testator, should not be permitted to succeed.
The majority emphasizes the quotation in Matter of Snow-den (31 NY2d 322, 327) from Matter of Charles (200 Misc 452, 461, affd 279 App Div 741, affd 304 NY 776) that the addendum " 'must be strictly construed in order that the major policy underlying [the] legislation itself is not defeated’ ”, but fails to consider the statements in the same case that, "what is important and operative is the 'intent of the settlor’ ” (31 NY2d, at p 329, quoting from Matter of Rockefeller [Hubbard], *79 12 NY2d 124, 134). It makes the addendum depend upon whether Olney takes by "adoption alone” (majority opn, at p 73), ignoring the fact that the addendum contains no such limiting language, and that the context in which those words appear in Matter of Park (15 NY2d 413, 418) is readily distinguishable from the instant case. It ignores as well the legislative history of the 1963 amendment which included, in Appendix F to the Second Report of the Temporary State Commission on Modification, Revision and Simplification of the Law of Estates (1963 NY Legis Doc No. 19, at 173) the statement that: "Where, however, the contest is not between natural and adopted children but between adopted children and specified remaindermen the exception in the statute would appear to apply, subject to the holding of Upjohn and those cases which follow it, that the statute yields to the intent of the testator.” Here, as Justice O’Connor pointed out (113 AD2d 651, 661-662), Jonathan could have had no knowledge of the adoption which took place 40 years after his death, there is nothing in the will to suggest that he intended to include adopteds and the motion papers contain no extrinsic evidence so indicating, the property passed on Winthrop’s death to his "oldest living son,” not to a class including both natural and adopted children, and the power of appointment was also limited to Jonathan’s bloodline.
The decisions of this court do not sustain refusal to apply the addendum in such circumstances. Indeed, the addendum has been applied to exclude an adopted child from taking in the most recent case in which we considered the question, Matter of Brooks (32 NY2d 752, affg 39 AD2d 942), as well as in Matter of Carll (27 NY2d 917, affg on opn at 34 AD2d 793), Matter of Ricks (18 NY2d 640) and Matter of Washburn (17 NY2d 895, affg 24 AD2d 83).
Brooks involved a will which gave the life tenant a power of appointment limited to issue and thus, like the power of appointment in Jonathan Gardiner’s will, was limited to the bloodline of the testator. Carll adopted the opinion (sic) at the Appellate Division, which held that an adopted child was not the "issue” of the income beneficiary and, therefore, was not entitled to the remainder, no extraneous facts having been shown and there being nothing in the will to suggest an intention of the testator to include adopted children so as to prevent operation of the precautionary addendum which was in existence when, in 1902, the will was drawn. The opinion distinguished Matter of Silberman (23 NY2d 98) on the ground *80 that there, by its own wording, the addendum was inapplicable, the foster parent having been survived by a natural child who would take to the exclusion of the remainderman even if there had been no adoption.
Ricks, as explained in Matter of Silberman (23 NY2d, at p 109, supra), affirmed exclusion of adopted children because of the ambiguity created by the testatrix having stricken from her will words relating to adopted children. Washburn[2] held the residuary legatees under the will of a life tenant, who also had a remainder interest, subject to being divested, under the will of his father, to be remaindermen within the meaning of the addendum, and concluded that the right of such legatees to take the corpus of the trust under the father’s will was not defeated by the life tenant’s adoption of a daughter after the death of his father.
Matter of Park (15 NY2d 413, 417, supra) established a presumption that “[a] testator or settlor must know that in the light of New York policy a foster child has exactly the same 'legal relation’ to the parent as a natural child.”[3] That statement was dictum, the holding of the case being that the foster parent there involved had left surviving both a natural child and an adopted child and thus was not a "foster parent dying without heirs” within the meaning of the addendum. It was in this context, there being a natural child who would in any event cut off the remainder, that the Park decision (at p 418) construed the addendum to speak to an "act of adoption [which] itself and alone cut off a remainder.” Viewed in the light of its facts, therefore, Park does not justify the majority’s conception that the addendum is inapplicable unless the passing of the testator’s property is Msolely dependent upon 'the foster parent dying without heirs.’ ” (Majority opn, at p 74 [emphasis supplied].) Moreover, review of the cases thereafter decided establishes that the Park presumption has never been applied to defeat the claim of a remainderman to which the addendum otherwise applied. Thus, Matter of Johnson (17 *81 NY2d 448) and Matter of Silberman (23 NY2d 98, rearg denied 23 NY2d 921, supra) both involved situations in which the contest was between natural and adopted children, not between an adopted child and remaindermen entitled to inherit if the foster parent died without heirs.
The other cases which held the addendum inapplicable and an adopted child authorized to take, Matter of Snowden (supra), Matter of Rockefeller (Hubbard) (supra), and Matter of Charles (supra), all involved powers of appointment which would have permitted the trust principal to be divided among those not testator’s descendants or within his bloodline. In Snowden each life tenant "was empowered to appoint any one he chose” (31 NY2d, at p 329); in Rockefeller the power of appointment was to the life tenant’s "issue or to such charities as she might appoint by will” (12 NY2d, at p 130); and in Matter of Charles the power included not only the life tenant’s children or the issue or any deceased child, but also "her husband” and "in any manner, share or proportion” (200 Misc, at p 454).[4] The holding of the three cases is embodied in Snowden’s statement that (31 NY2d, at p 329): "Having permitted the child in the circumstances posited to appoint any one he selected, and having contemplated that, in default of appointment or of natural issue, persons not related to him by blood might share in the trust, the settlor must be deemed, by his lack of concern for bloodlines, to have had in mind that adopted children might likewise take.”
That ruling does not, however, support the majority’s suggestion that the power of appointment of itself is sufficient to make the addendum inapplicable.[5] To the contrary, here the limitation of the power of appointment to a "male relative * * * bearing the name Gardiner” and of the remainder after *82 Winthrop’s life estate to his "oldest living son,” in default of which the remainder is given to Isabel and Frances, both within the bloodline, evidence quite clearly Jonathan’s concern for bloodlines. That concern being expressed and there being neither a natural child nor an unlimited power of appointment to provide a basis for not applying the addendum, it requires, as the Appellate Division held (113 AD2d, at pp 661-662), that Olney, as an adopted child, not be "deemed the child of the foster parent so as to defeat the rights of remaindermen.”
In a number of other respects the majority misconceives the effect of the addendum. The suggestion that it does not apply because "Jonathan’s will contemplated that his property could pass by intestacy” (majority opn, p 74; see also, p 75) is simply irrelevant, for the intestacy provision was operative only if Winthrop died without heirs and Isabel and Frances both predeceased him. The issue before us is whether the remainder to Isabel and Frances can be cut off by adoption, not whether under a later remainder provision there could be a distribution in intestacy if Isabel and Frances died before Winthrop. Matter of Brooks (supra) is authority to the contrary (see also, Matter of Notman, 56 Misc 2d 877). Indeed, were that event to come to pass, a distribution in intestacy would occur even if the will did not so provide, although to Jonathan’s rather than Winthrop’s distributees.
Likewise irrelevant is the fact that the "real property left to Winthrop in the will could have been sold by the executor or trustee, in its discretion, any time before Winthrop’s death.” The most that the sale provision indicates is that Jonathan wanted real estate he owned to remain in the hands of a male Gardiner. The trust consisted of both real and personal property, however, and the addendum expressly governs "the passing and limitation over of real or personal property” (emphasis supplied). It therefore governs disposition of the trust remainder even if, as would be the case had such a sale been made, the principal of the trust consisted solely of personal property.
Finally, the only relevance of change of name being the will provisions limiting exercise of the power to a "male relative of mine bearing the name Gardiner,” the majority’s discussion (at p 75) of change of name is inconsistent with its conclusion (at p 75) that it need not consider the effect of the power of appointment.
*83 It follows that unless the addendum is to be read out of the statute notwithstanding the Legislature’s intention as to pre1964 wills to preserve it, Jonathan’s intention as evidenced by his will mandates its application and the exclusion of Olney because to deem him the child of Winthrop would defeat the rights of the remaindermen, Isabel and Frances.
At the very least, however, the unusual circumstances of this case require denial of the motions by the trustee and Olney and the grant of Frances’ application for discovery. It is difficult to conceive a purpose other than frustration of the remainder for the adoption of Olney, a 32-year-old lawyer practicing in California, by Winthrop, who had had a cancer operation four years before, and Beth, a chronic alcoholic who died of that disease within six months after the adoption. The more particularly is this so in light of the fact that Winthrop and Beth divided their time between New York and Florida (where Winthrop’s will was executed and where it was probated). If those circumstances do not conclusively establish, they certainly strongly suggest, that Olney’s adoption contravenes the purpose of the addendum, which, as we have several times declared, was designed to prevent " 'the perpetuation of fraud on the rights of the remaindermen "through an adoption for the very purpose of cutting out a remainder” ’ ” (Matter of Snowden, supra, at p 327, quoting from Matter of Upjohn, supra, at p 378, quoting from Matter of Walter, 270 NY 201, 206); "to prevent the device of an adoption from being used to cut off a remainder which would have followed had there been no child” (Matter of Park, supra, at p 416). Thus, if Frances[6] is not awarded judgment declaring Olney not entitled to take, on the basis of the will alone, she should be granted discovery. There is a sufficient basis in the papers before the court for doing so,[7] for although, as the majority notes, Beth died before Winthrop executed his will, she died, *84 as noted above, but 16 days before that will was executed, leaving a daughter Darcy, and under circumstances suggesting that her acute alcoholism may have played a part in Olney’s adoption and change of name in order to qualify him to take either as Winthrop’s son or as his appointee.
Ill
Although the Appellate Division held that the addendum prevented Olney from taking as Winthrop’s "oldest living son,” it concluded that he could, nevertheless, take by reason of Winthrop’s exercise of the power to appoint to a male relative of Jonathan’s bearing the name Gardiner, Olney being a natural male relative of Jonathan’s, Domestic Relations Law § 117 (2) having preserved his right to take "under the will of * * * natural * * * kindred”, and the adoption decree having changed his name to Gardiner.[8] For the reasons set forth in part II above, I agree with the Appellate Division that the presence of the power did not affect the applicability under Domestic Relations Law § 117 (3) of the precautionary addendum. In holding that Domestic Relations Law § 117 (2) permitted Olney to take under the power, however, the Appellate Division failed to consider that, as a matter of the law of powers of appointment and wholly apart from the adoption or the addendum, Jonathan’s clearly declared purpose in limiting the appointment to "a male relative [named] Gardiner” would be frustrated if any male relative could qualify for appoint *85 ment by simply changing his name. Such a frustration of the testator’s purpose has long been deemed by the law a "fraud on the power.”[9]
In Matter of Carroll (274 NY 288, 298-299, reh denied 275 NY 536), this court held with respect to fraud on a power of appointment:
"Upon the general question the law of England is correctly stated in Halsbury’s Laws of England (Vol. 23 [1st ed.], pp. 58-62):
" 'A person having a limited power must exercise it bona fide for the end designed; otherwise the execution is a fraud on the power and void. Fraud in this connection does not necessarily imply any moral turpitude, but is used to cover all cases where the purpose of the appointor is to effect some bye or sinister object, whether such purpose be selfish or, in the appointer’s belief, a more beneficial mode of disposition of the property and more consonant with that which he believes would be the real wish of the creator of the power under the circumstances existing at the date of the appointment.
" 'In all cases of fraudulent execution, the fraud consists in the exercise of the power for purposes foreign to those for which it was created and the exercise of the power may be held fraudulent on any of the three following grounds:
" '(1) If the execution was made for a corrupt purpose.
" '(2) If it was made in pursuance of an antecedent agreement by the appointee to benefit persons not objects of the power, even although the agreement in itself is unobjectionable. An appointment to a child an object of the power, and a contemporaneous settlement by him of the appointed fund, is, however, valid unless it can be shown that the appointment was made in pursuance of a contract inducing the appointment.
*86 " '(3) If it was made for purposes foreign to the power, although such purposes are not communicated to the appointee before the appointment and although the appointor gets no personal benefit’ ”. (Emphasis supplied.)
A like statement is contained in the Introductory Note to chapter 20 of the Restatement (Second) of Property (Donative Transfers) (at 309): "These attempts to benefit non-objects through the appointment to an object are described as 'frauds on the power.’ This phrase is not accurately descriptive, for an appointment may be a 'fraud on the power’ and a 'fraudulent appointment’ even though the donee honestly and reasonably believes what has been done is authorized and even though the object to whom the appointment is made and the non-object sought to be benefited are quite unaware of the existence of the power, the making of the appointment, or the result which the donee desires to accomplish.” Matter of Carroll (supra) involved a power to dispose of property "to and among her children or any other kindred” which the donee exercised by appointing $250,000 to a cousin who, by letter, promised to pay the donee’s husband $100,000. In light of the written agreement the court held the entire appointment to the cousin invalid. The decision makes clear, however, that written evidence is not required for it analyzed an earlier English case (Pryor v Pryor, 2 DeG, J & S 205) and noted (at p 300) that "[t]here the bargain apparently was largely a matter of inference but it was found to exist from the acts of the parties” (see also, Restatement [Second] of Property [Donative Transfers] § 20.2 comments a, b, f).
Also instructive with respect to the present case is Morton v American Sec. & Trust Co. (276 NY 475, remittitur amended 276 NY 601, affg without opn 251 App Div 31). It involved the remainder of the life estate of Mary Morton under the will of her mother Anna. Under Anna’s will the remainder went to Mary’s issue, if any, and in default of issue to her heirs at law and next of kin, subject, however, to Mary’s power if she left no issue to appoint one half of her share, the remaining half to go to her heirs at law and next of kin. Mary Morton had no children of her own but had adopted three children. She exercised the power to set up a trust for one and left half the corpus for the benefit of the other two. The court held the precautionary addendum to prevent their taking as children and as to their claim that they were entitled as Mary’s "heirs at law” held (251 App Div, at p 36): "The declared limitation by the power of appointment over one-half of a daughter’s *87 trust share should not be thwarted long after the death of the testatrix by the expedient of the daughter’s adopting children to take one-half by appointment and the other half as her heirs at law and next of kin.” Likewise in the present case the declared limitation of the power of appointment to male relatives named Gardiner should not be thwarted long after Jonathan’s death by the expedient of Olney having changed his name, wholly aside from any bargain with Winthrop, if bargain there was.
The extent to which this court has gone in protecting the testator’s limitations upon a power of appointment is indicated by Matter of Kennedy (279 NY 255) and Farmers’ Loan & Trust Co. v Mortimer (219 NY 290). Kennedy held that the power to appoint a fee did not permit appointment of a life estate and in so doing said (279 NY, at p 263): "We must look exclusively to the will of Mr. Kennedy to determine the terms, scope and limitations upon the power. It must be exercised strictly according to its terms (3 Bogert on the Law of Trusts & Trustees, p. 1692). The donee was unauthorized to go outside of or exceed the power given; she was required to exercise it, if she acted at all with reference to it, within its specific terms. In construing the power, we are required not only to consider its express terms but also, if necessary, the general plan, purpose and intent of the testator as found within the express provisions and within the will as a whole. 'The intention of the donor of the power is the great principle that governs in the construction of powers’ (4 Kent’s Commentaries, p. 345)”. In Mortimer, in upholding denial of specific performance of contracts to exercise a power of appointment, Judge Cardozo quoted (219 NY, at p 294) the holding of an English case, " 'that equity * * * will never uphold an act which will defeat what the person creating the power has declared, by expression or necessary implication, to be a material part of his intention.’ ”
The principle is not just decisional. It finds present expression in EPTL 10-6.2 (a) (which derives from Rev Stat of NY, part II, ch I, tit 2, § 121): "the directions of the donor as to the manner, time and conditions of the exercise of a power must be observed” (emphasis supplied). And as Dean Rohan notes (NY Civ Prac — EPTL, vol 9B, If 10-6.2 [2], at 10-201), "fraudulent intent is not necessary; it is the existence of a benefit to one not a permissible appointee which invalidates the appointment.” Thus, in Matter of Trowbridge (124 Misc 317), an *88 appointment to a donee’s husband under a power to appoint to descendants was held invalid.
Had OIney simply exercised the right to change his name accorded him by the common law (Smith v United States Cas. Co., 197 NY 420), that self-serving act clearly would not have qualified him to take under the power. It was no less a fraud on the power because the name change was accomplished by an adoption decree, the more so because the adoption contravened the precautionary addendum.
IV
The order of the Appellate Division should be modified to deny the motions of OIney and the trustee for partial summary judgment and to grant the Frances motion, joined in by the guardian ad litem, to the extent that it seeks judgment declaring that OIney is not entitled to any part of the remainder under Jonathan T. Gardiner’s will. The certified question should be answered in the negative.
Chief Judge Wachtler and Judges Alexander and Mahoney* concur with Judge Kaye; Judge Meyer dissents and votes to modify in a separate opinion in which Judges Simons and Hancock, Jr., concur.
Order affirmed, with costs to all parties appearing separately and filing separate briefs payable out of the estate. Question certified answered in the affirmative. Appeal by OIney Mairs Gardiner dismissed, without costs.

.Whether by a prior marriage or as a child of Winthrop’s marriage to Beth is unclear from the record, but, in view of the limitations of the remainder to Winthrop’s "oldest living son” and of the power of appointment to a male relative, is immaterial.

.Both Carll and Washburn are distinguished in Matter of Snowden (31 NY2d 322, 329) as involving wills in which the trust remainder was explicitly limited to the grantor’s "bloodlines” and the life tenants had no power of appointment.

.In doing so it reversed the presumption stated in Matter of Upjohn (304 NY 366, 375) that "in the absence of any indication of the testator’s intent, it will be assumed that the testator did not envisage adopted children taking under the limitation” (to lawful issue or descendants surviving).

.The Snowden opinion emphasized that although the Charles power of appointment was limited it included the life tenant’s husband, italicizing the word "husband” (31 NY2d, at p 328). That fact was apparently overlooked in Matter of Park, however (see, 15 NY2d 413, 418).

.Majority opn, at p 74. The suggestion is apparently predicated on the language in Park discussed above. But Park was not a power of appointment case and, as noted (n 4, supra), apparently misapprehended the power involved in Matter of Charles to which it referred. Clearly in light of those facts and of the three power of appointment cases discussed in the text above, the Park language on which the majority relies cannot be read as holding that the mere presence of a power of appointment, no matter how limited, is enough to make the addendum inapplicable. Indeed, in Matter of Brooks (32 NY2d 752, 753) the argument that the power of appointment was sufficient to make the addendum inapplicable was expressly rejected.

.That Isabel has not appeared in this proceeding provides no contraindication for it is a reasonable inference that Olney, who will receive the entire $3,000,000 remainder to the exclusion of both Isabel and Frances, will take care of any needs of Isabel, his mother, that she cannot provide for herself.

.I have not overlooked the Surrogate’s ruling, in reliance on Matter of Rockefeller (Hubbard) (12 NY2d 124) that motivation is irrelevant. In so holding, however, he overlooked the fact that Rockefeller was decided prior to Park’s construction of the Domestic Relations Law adoption provision as creating a presumption that adopteds were intended to be included, and is, therefore, distinguishable. That this is so is made evident by the following passage from Rockefeller (12 NY2d, at p 134 [emphasis supplied]): "It *84 matters not whether the foster parent, in adopting a child, was motivated by good or bad intention for, in any event, the mere fact of adoption satisfies the condition of the statute and bars inheritance by the adopted child or children unless an intention to the contrary appear (Matter of Leask, supra). If, however, the settlor at the time he executed the deed of trust intended to include adopted children as issue entitled to take the remainder, it follows with equal cogency that the adoption motive is of no consequence; the intent of the settlor conditions the operation of section 117.”

.Having concluded that the change of name effected by the adoption decree was sufficient, the Appellate Division did not consider whether the fact that when Olney was seven years old he was baptized as Olney Blanchard Gardiner Hairs was sufficient to qualify him for appointment. Clearly it was not, for middle names are of no legal significance (Grygorewicz v Domestic & Foreign Discount Corp., 179 Misc 1017, 1019; see also, Matter of Snook, 2 Hilt 566) and, in any event, Winthrop’s will was executed in 1975, after the adoption decree of August 14, 1974 had changed Olney’s name to Olney Hairs Gardiner and directed (as Domestic Relations Law § 114 provides) "that the said foster child hereafter be known by that name.” Validity of the exercise of the power, thus, stands or falls on the basis of the adoption decree change of name alone.

.Olney’s memorandum in response to the motion for leave to appeal to this court states that fraud on the power was never raised in the courts below, but the trustee’s affidavit in opposition states as to "fraud on the power” and "bargain behind,” that "[t]hese issues were alleged in the lower court and found to be irrelevant,” and the trustee’s brief to us only suggests that the question "was not raised on appeal to the Appellate Division.” The guardian’s first and second supplemental reports did not use the words "fraud on the power,” but the first report argued that Olney was not within the testator’s intention, citing and analyzing the Morton case (infra), and the second report clearly stated that Olney was not brought within the power by the change of name. The issue is, therefore, properly before us (Telaro v Telaro, 25 NY2d 433, 438).

Designated pursuant to NY Constitution, article VI, § 2.